**H. S. D. CO. v. KAVANAGH, Collector of Internal Revenue.**

Civ. A. No. 7362.

United States District Court
E. D. Michigan, S. D.
Sept. 30, 1949.

As amended Jan. 11, 1950.
Motion for New Trial Overruled
April 4, 1950.

John F. Langs of Detroit, Mich., for the plaintiff.

United States Attorney Edward T. Kane and Assistant United States Attorney Roger P. O'Connor, of Detroit, Mich., and Elizabeth B. Davis, of Washington, D. C., for the defendant.

LEDERLE, Chief Judge.

### Findings of Fact

1. · This action involves a claim by plaintiff, H. S. D. ·Company, a Michigan corporation, formerly known as Knight-Morley Corporation, hereinafter referred to as taxpayer, for the refund of excess profits tax for the fiscal year ending April 30, 1944 in the amount of $18,834.11, which, less a post-war refund of $1883.41 concededly received by the taxpayer, leaves a net claimed overassessment of $16,950.70. Many of the facts are not in dispute and were stipulated by the parties. This was supplemented by a small amount of testimony. The stipulations of fact are hereby adopted as part of these findings and only a summary of the facts will be made to indicate the basis for the decisions. The basic issue is whether or not $16,337.79 contributed by the taxpayer to employees' trusts is deductible in computing taxes. If the contributions to the two trusts are disallowed, there is a carry-back of $16,199.98 from the year 1945, of which $12,501.83 should be carried back to the year 1944, and $3,698.15 should be carried back to the year 1943; that the plaintiff sustained a net operating loss for the fiscal year ended April 30, 1945 in the amount of $16,199.98, and had an unused excess profits credit for that year of $6,815.92, and a recomputation of the plaintiff's tax liabilities for the fiscal year ended April 30, 1944 in accordance with these findings shows that the carry-back of net operating loss and the unused excess profits credit from 1945 to 1944 is not sufficient to establish an overpayment of excess profits tax for that year.

2. Taxpayer was incorporated on April 1, 1937 as a Michigan corporation, with an authorized capital stock of $1000, which was later increased to $66,500, of which $11,893 was outstanding as of April 30, 1946. Taxpayer manufactured automobile accessories in its plant at 620 East Hancock Street, Detroit, until April 30, 1942, at which time it commenced to work on a con-

tract to manufacture airplane parts for war purposes. The taxpayer manufactured airplane parts in this plant until November 15, 1944. At such time, title to the plant stood in the name of its Executive Trust, as hereinafter described, and title to the machinery stood in the name of the taxpayer. On November 15, 1944, an agreement was made to sell this plant with the airplane manufacturing machinery as a going business, and the balance of the taxpayer's machinery was placed in storage. From November 15, 1944 through the year 1946, taxpayer operated as a selling corporation, doing no manufacturing business itself, but having certain manufacturing done for it by other companies.

3. On April 29, 1942, the day before starting its war manufacturing, taxpayer executed two trust agreements, naming its employees as beneficiaries. One of such instruments, known as the "Employees' Trust," was between the taxpayer and John F. Langs, Trustee. This was a stock bonus, profit-sharing and pension plan for hourly-paid employees, running 10 years, with a possible 5 year extension by the Trustee with the advice, consent and direction of the Advisory Committee provided for therein. The second instrument, known as the "Executive Employees' Trust," was a profit-sharing, stock bonus and pension plan for the executive officers of the corporation, of which at that time there were three, George C. Knight, Charles E. Morley and Harold S. Davis, who signed this trust agreement as parties with the corporation and the Trustee, John F. Langs. This trust was for a period of 5 years, with a possible 5 year extension at the sole and exclusive discretion of the Trustee, provided, however, that the trust would terminate upon the death of all executive officers. In other respects, these two agreements contained somewhat similar provisions, among others, for cash contributions by formula within the statutory limit, subject to the taxpayer's right to cease contributions at any time. According to the technical language of the agreements, the trusts might have been operated within the limitations of Section 165(a) of the Internal Revenue Code, as amended, 26 U.S.C.A. § 165(a), so that

contributions by the taxpayer would have been deductible for tax purposes under Section 23(p) of the Code, 26 U.S.C.A. § 23 (p). It is the contention of the Government, however, that, in operation, the trusts did not conform to Section 165(a), because the benefits under the plan clearly discriminated in favor of employees who were officers and shareholders, and because the trust device was used mainly as a means of diverting profits and building up corporate capital reserves distributable over a period of years to the stockholder executives, avoiding current corporate taxes and spreading out the key executives' and shareholders' earnings, which would otherwise attain higher brackets.

4. The trust for the executive employees was operated in such a way as to result in a net profit in approximately three years of $31,838.28, all of which, in effect, resulted from a diversion of corporate profits. At the end of the fiscal year 1945, this trust fund belonged to four participants. However, by the end of the fiscal year 1946, two of the participants had dropped out and the statement of assets and liabilities showed interest of two active participants as approximately $47,000. Those two participants were Charles E. Morley and Harold S. Davis, who, together with their wives, owned all of the outstanding Class A stock of the corporation, and each of them owned 15.5% of the Class B stock.

On the other hand, the trust for the employees was operated in such a manner that the only income up to April 30, 1946, arose from the sale of 73 shares of Class B stock at a profit of $73. Later, in 1947, a dividend of $672 was received by this trust.

5. (a) On April 30, 1942, the day following execution of those trust instruments, the taxpayer contributed $5000 to the Employees' Trust, which sum on the same date was converted into 100 shares of the Taxpayer's Class B treasury stock. No further sums were transferred by the taxpayer to this trust until May 12, 1943. The only investments ever made for this trust were in the taxpayer's Class B stock.

(b) The first contribution to the Executive Trust was $10,000, transferred by the

taxpayer on April 30, 1942, which sum on the same date was converted into 200 shares of the taxpayer's Class B treasury stock, leaving no cash balance in said trust account.

On June 10, 1942, the taxpayer contributed $250 to the Executive Trust, and on the same date, the Executive Trustee used $198.70 of this sum to pay premiums on policies insuring the lives of the executives in favor of the Executive Trust.

On June 16, 1942, the taxpayer contributed $500 to the Executive Trust, which sum on the same date the Trustee re-transferred to the taxpayer as consideration for an option to purchase in the name of the Executive Trust the real estate comprising the taxpayer's plant at 620 East Hancock Street, Detroit.

On July 30, 1942, the taxpayer contributed $4801.22 to the Executive Trust. Out of this sum, the Trustee on the same date re-transferred to the taxpayer $4451.95 to complete the down payment on the price for transfer of title to the taxpayer's plant into the name of the Executive Trust; and $147.25 was used for payment of insurance premiums.

Using the stipulated figures of trust proceeds from sale in 1945, of $30,396.16, with a profit of $14,000, the price by which the Executive Trust purportedly acquired title to the taxpayer's real estate must have been approximately $17,000. There was a down payment of $4951.95, with the balance payable on land contract at $400 per month.

As part of this same real estate transaction on July 30, 1942, this property was, on the same day, leased back to the taxpayer by the Executive Trustee at a monthly rental of $500, which was increased to $700 one year later. The first monthly payment on the land contract was made August 5, 1942, and the first monthly rental was paid August 12, 1942. The land contract payment dates varied from the first to the ninth of the month. Rent payments varied from the second to the nineteenth of the month.

At the conclusion of the war manufacturing, there was an attempt made to dispose of the plant and machinery used by tax-

payer, and on April 2, 1945, the Executive Trustee, Mr. Langs, transferred title to this real estate to a third party client of Mr. Langs at a profit of approximately $14,000, apparently in consummation of an arrangement made on November 15, 1944. No moneys of any kind were received by this trust from the time of rental payment on November 6, 1944, to receipt of sale of building proceeds on April 2, 1945, nor were any land contract payments made by it. The proceeds of this sale were shown as $30,396.16 paid into the trust account on April 2, 1945, of which $30,000 was used on the same day, April 2, 1945, to purchase 600 shares of the taxpayer's Class B stock in the name of this trust.

At no time during the period when title to this real estate stood in the name of the Executive Trust, from the first option payment on June 16, 1942 to April 2, 1945, did this trust pay any taxes upon this property.

6. At all times since the execution of these two trust agreements, Mr. John F. Langs has acted as Trustee thereunder, as well as being one member of a three-man advisory board whose duty it was to direct the Trustee's investment of trust funds. Throughout the same period and for some time prior thereto, Mr. Langs has also acted, and still acts, as attorney for the taxpayer-corporation.

It is the position of Mr. Langs in this case, acting as attorney for the taxpayer, that his actions as Trustee were independent of any control by the taxpayer or any of its officers.

In connection with the dealings of Mr. Langs as Trustee and as attorney for the taxpayer with reference to the ultimate sale of the property at 620 East Hancock Street, Detroit, which stood in the name of the Executive Trust, and the machinery therein, which stood in the name of the taxpayer company, Mr. Langs testified: "In the latter part of 1943 I deemed it advisable to dispose of the investment which I had at 620 East Hancock Avenue in the City of Detroit. *I requested the company to sell the property,* and it was listed with different real estate brokers; but no sale was consummated; and in the summer of 1944

*I requested the company to offer for sale some of their machinery* so that the building and machinery could be sold as a going business. Again there was no sale consummated, and I, at long last, as Trustee, looked for a purchaser myself, and found one; and the sale was consummated of the property in November of 1944." (Italics added.)

7. During the period in question, the only investments in the name of either trust, other than the real estate transaction involving the taxpayer's plant and some insurance policies for the Executive Trust, were in Class B stock of the taxpayer. The Class B stock was preferred as to dividends and liquidation, was nonvotable and was convertible into Class A stock. The Class A stock had the entire voting control of the taxpayer-corporation. There was Class A treasury stock available so that the Trustee could have converted the Class B stock held in the names of the trusts into Class A voting stock which could control the corporation. In answer to the court's inquiry as to the Trustee making a decision to so convert for the benefit of the trust, Mr. Langs replied: "I would never have done such a thing. It would have been entirely dishonest."

8. At all times material, the outstanding Class A stock of the taxpayer was owned by Charles E. Morley and wife, between them 50%, and Harold S. Davis and wife, between them 50%. Messrs. Morley and Davis were officers of the taxpayer and were also beneficiaries of the Executive Employees' Trust. At times, up to three others participated as co-beneficiaries. During the fiscal years ended April 30, 1943 and 1944, these two individuals, Charles E. Morley and Harold S. Davis, each owned 15.5% of the Class B stock of the taxpayer.

9. For the respective fiscal years ending April 30, 1942, 1943 and 1944, Charles E. Morley was paid $10,600.00, $12,605.73 and $18,256.55, and Harold S. Davis was paid $8000.00, $12,605.73 and $18,256.55, basic salaries.

10. As of April 30, 1945, the Executive Employees' Trust had assets of $55,415.85, consisting of cash $1235.74, investment in "B" stock of taxpayer of $48,800, and insurance contracts of $5380.11 at cost, being the premiums paid. The insurance contracts insured the lives of the executives and were payable to the Trustee for the benefit of the Executive Trust, and not for the benefit of any particular participant under the trust.

During the period from April 29, 1942 through April 30, 1945, the Executive Employees' Trust realized a net profit of $31,838.28, which had been realized solely from dealings in taxpayer's stock and real estate.

11. The statement of assets and liabilities of the Executive Employees' Trust, as of April 30, 1946, showed interests of two active participants, Charles E. Morley and Harold S. Davis, as $47,047.29. The assets as of April 30, 1946 also include insurance contracts which were carried at cost value rather than cash value.

12. As of April 30, 1945, the Employees' Trust had assets of $12,804.51, consisting of cash $1604.51, and investment in Class B stock of the taxpayer $11,200. The only income of the Employees' Trust, for the period April 20, 1942 through April 20, 1946, aside from the contributions of the taxpayer, arose from the sale on December 16, 1945 of 73 shares of Class B stock of taxpayer at a profit of $73. In 1947, a dividend of $672 was paid on taxpayer's stock.

13. At times during the years in question there were twenty-three active participating employees in the Employees' Trust and four participating employees in the Executive Employees' Trust.

14. The taxpayer's trust plan was originally approved by the Commissioner as complying with Section 165(a), Internal Revenue Code, but on April 8, 1948, the Commissioner notified the taxpayer that such plan did not meet the requirements of this Section, as amended, for the following reasons:

"1. The conduct of the trusts has been of such a nature as not to operate for the exclusive benefit of the employees and their beneficiaries as required by section 165(a) of the Internal Revenue Code, as amended. The trust funds have been invested in stock

of the company for no purpose other than for the benefit of the employer.

"2. Approximately one-half of the employer's contribution to each trust for F-1943 was returned to the employer. The use of corpus of the trust in this manner is not in accordance with section 165(a) (2) of the Internal Revenue Code, as amended.

"3. The operation of the trusts discriminated in favor of the stockholders and supervisory employees which is prohibited by statute. During the four years the Employees' Trust had income of only $73.00 while the Executive Trust more than doubled the contributions it received. Forfeitures and unallocated funds of a considerable amount will eventually inure to the two stockholder participants in the Executive Trust. Interest in the Executive Trust by the two stockholder participants is approximately equal to 60% of the compensation otherwise paid such participants during years for which the employer made contributions to the trust, whereas the corresponding percentage in the Employees' Trust is equal to only 5%."

15. The rights of the employees under this plan were forfeitable at the time the taxpayer contributed thereto for the reason that the Employees' Trust agreement provided that when an employee, voluntarily or involuntarily, left his employment with the company for any reason, except cause (which is gross misconduct, dishonesty or insubordination) he would receive 10% of the contributions standing to his account for each year of service, up to five years, and 5% of such contributions for each year over five years, and 100% of such contributions only at or after ten years, and the parties stipulated that the provisions of the Executive Trust agreement, as amended, as to payment of benefits to beneficiaries and terminations were the same as provided for beneficiaries of the Employees' Trust.

16. The taxpayer sustained a net operating loss in the fiscal year ended April 30, 1945, in the amount of $12,501.83 and had an unused excess profits credit for that year of $6815.92.

17. The said trusts were not operated for the exclusive benefit of the employees and their beneficiaries, but were conducted in such a manner as to discriminate in favor of the executive employees, two of whom were substantial stockholders of the corporation, and mainly as a means of diverting corporate profits and building up corporate reserves distributable over a period of years to stockholder executives.

## Conclusions of Law

1. This court has jurisdiction of this case arising under an Act of Congress providing for internal revenue. 28 U.S.C.A. § 1340.

2. Where, as here, an employer sets up at one time two stock bonus, profit-sharing and pension trusts for employees, such trusts should be considered as parts of a single plan for the purpose of determining whether there has been discrimination in favor of executive employees and shareholders inhibited by Section 165(a), Internal Revenue Code.

3. In computing income for the purpose of determining income tax liability, contributions made by an employer to or under a stock bonus, pension or profit-sharing plan are deductible in the year paid only if the trust created under such plan is exempt under Section 165(a), Internal Revenue Code, as amended, or, if not so exempt, such contributions are deductible in the year paid only in the case of an employee whose beneficial interest in such contribution is non-forfeitable at the time made. Section 23(p) (1) and (3), Internal Revenue Code; Section 165(c), Internal Revenue Code; and Mertens' Law of Federal Income Taxation, Section 25.71.

4. Where, as here, it appears that an employer's stock bonus, pension and profit-sharing plan is not operated for the exclusive benefit of the employees, but as a mere subterfuge to build up the employer's capital reserves and to provide what are in effect benefits which discriminate in favor of executive officers who are shareholders, and where, also, the Commissioner has disapproved such plan upon a finding

that there is such discrimination, contributions to such plan are not exempt under Section 165(a), Internal Revenue Code, so as to be deductible in the year paid under Section 23(p) (1), (A) (B) (C), and (3), Internal Revenue Code.

5. Where, as here, an employer's contributions to a trust are not exempt under Section 165(a), Internal Revenue Code, such contributions are not deductible by the employer in the year paid where there is no employee whose beneficial interest in such contribution is non-forfeitable at the time the contribution is made Section 23(p) (1) (D) and (3), Internal Revenue Code.

6. It therefore follows that the taxpayer is not entitled to the claimed deduction, and the Commissioner properly denied the same.

7. The parties are directed to present to this court on October 17, 1949 at 10 a. m. a proposed judgment in conformity herewith.