**DULANSKY et al. v. IOWA–ILLINOIS GAS & ELECTRIC CO.**

No. 14288.

United States Court of Appeals
Eighth Circuit.

Oct. 25, 1951.

Walter A. Newport and Donald A. Wine, Davenport, Iowa (Wayne G. Cook and Newport, Bybee & Wine, Davenport, Iowa, were with them on the brief), for appellants.

Larned A. Waterman, Davenport, Iowa (Charles D. Waterman, Otto C. Bauch and Lane & Waterman, Davenport, Iowa, were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

GARDNER, Chief Judge.

This appeal is from a summary judgment entered on motion of defendant (appellee) in an action brought by plaintiffs (appellants) to recover damages on account of the death of Gary Dulansky, plaintiff's minor son, caused by the alleged wrongful act of defendant. Omitting formal allegations and allegations not here material, it is alleged in the complaint that Gary Dulansky, the ten-year-old son of plaintiffs Paul Dulansky and Bonnie Dulansky, was on December 1, 1948, proceeding west on

East Elm Street in the City of Davenport, Iowa, on a bicycle in a cautious and careful manner, when a bus operated for defendant by Leonard W. Hughes approached plaintiffs' intestate from the rear and due to the negligence of defendant's operator collided with and struck plaintiffs' decedent, knocking him and his bicycle to the pavement and inflicting injuries upon him from which he died on said date; that the defendant, a corporation, was operating a bus line in the City of Davenport, Iowa; that the death of plaintiffs' minor son was the direct and proximate result of the negligence of defendant's operator in operating the bus in a reckless and careless manner, in failing to keep a proper lookout and observe plaintiffs' decedent in time to avoid striking him, in failing to give any audible warning signal by bell or horn that defendant's bus was approaching plaintiffs' decedent from the rear, in failing to take due precautions for the protection of decedent after the operator knew or should have known of the presence of said child on said street, in not having his bus under control as he approached said minor child and in not bringing said bus under control when passing said child and in causing the bicycle on which said child was riding to be thrown to the street, in operating the bus at an excessive rate of speed and failing to reduce the speed after seeing plaintiffs' decedent riding a bicycle in the street and in passing or attempting to pass said decedent, and in not operating the bus in such a manner and at such a speed as to be able to stop within the assured clear distance ahead. Defendant by its answer put in issue the charge of negligence, and pleaded contributory negligence of the child and of the plaintiffs.

Defendant interposed a motion for summary judgment on the ground that the claim of plaintiffs involved no genuine issue as to any material fact and that defendant was entitled to a judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. In support of its motion defendant submitted transcript of the testimony taken before the coroner's jury at an inquest involving the question of the death of Gary Dulansky, affidavit

of Leonard W. Hughes, operator of the bus, affidavit of Andrew Nielson, the sole passenger on the bus at the time of the accident, and the affidavit of two physicians. The plaintiffs likewise submitted affidavits of certain physicians, affidavits of themselves, and affidavit of one of their attorneys, and they too relied upon the transcript of the testimony submitted at the coroner's inquest. There were also submitted answers to certain interrogatories, and possibly other documentary evidence.

The accident occurred late in the afternoon of December 1, 1948. While the bus was traveling in a westerly direction along Elm Street the driver noticed the boy, Gary Dulansky, riding his bicycle, also going in a westerly direction, some distance ahead of the bus and the operator of the bus in his testimony before the coroner's jury, said: "I seen this boy go on the bridge and I watched him and he was riding his bicycle in an unsteady manner."

At the time of the accident the boy was wearing an aviator's leather helmet, covering his entire head except his face. The street was about thirty feet in width; the bus weighed 10,150 pounds, was twenty-six feet, five inches long, and approximately seven feet, ten inches in width. The speedometer on the bus was not working but the operator estimated that he was driving at a speed of eighteen miles per hour as he approached the place where he attempted to pass the boy. The bus and the boy, as they moved westwardly, crossed a bridge. As the bus left the west end of the bridge the operator accelerated its speed preparatory to passing the boy on the bicycle. The relative positions of the boy and the bus in the street are in some dispute. The driver of the bus did not honk his horn but as the front of the bus drew up to a point opposite the rear of the bicycle the front of the bicycle tipped sharply toward the bus. Immediately previous to this the boy was coasting, not pedaling. As the driver of the bus started to pass the boy he observed that the boy had swerved to the left so as to be ahead of the bus and was looking backward over his left shoulder directly toward the head end of the bus. Observing this, the opera-

tor of the bus turned sharply to the left and applied the air brakes. This so suddenly impeded the speed of the bus that the lone passenger, with difficulty, by holding onto the back of the driver's seat, saved himself from being thrown clear across the bus, and there was noise from the skidding of the wheels on the pavement. The driver testified at the coroner's inquest that: "I felt them (the tires) skid and then they took ahold and threw me to the south curb."

In giving his version of how the accident happened the driver in his testimony said: "My version is, from the way that bicycle fell, that when that bus came up in the middle of the street, he was facing south when I went past him, directly south, and I think he lost all sense of motion, balance and everything else when that big bus started whizzing past him and he came to a complete stop with his front wheel cramped like that and it looked like he fell back into the street and struck his head."

The sole passenger, Andrew Nielson, in his testimony among other things said: "We'd just gotten over the viaduct there on Elm Street and I saw a boy on his bicycle—appeared right out in front of this bus, not all the way in front of it but a little to the right, you understand, and the bus operator swung that bus to the left and almost threw me out of my seat, the way I was sitting there with my feet on the floor and ahold of the back of the operator's seat—that saved me from being thrown clear across the bus, but when he did that he saved this boy, I think, from getting under the wheels of that bus, and he almost hit the curb."

In answer to an inquiry whether or not he had heard any impact this witness said: "Nothing like that, no. I had—my own opinion is, if you want that—I can't see how the boy fell hard enough to fracture his skull, just from falling off a bicycle, wearing that helmet, you know, but then I am no authority on those things."

Although the bus driver testified that he was sure he did not hit the boy, when he stopped the bus he got out and went back there and found the boy lying on the pavement, blood coming from his ears, nose and mouth. He was later taken to the hospital and died almost immediately on arriving there. The medical testimony was to the effect that he suffered a basal skull fracture. Doctors, one of whom examined the patient, expressed the opinion that death had been caused by the boy falling on the pavement. Doctors for the plaintiffs expressed the view from the facts stated that the boy did not suffer the injuries by merely falling on the pavement. Further summary of the testimony we think is unnecessary. The court, after having the matter under advisement for six months filed elaborate findings of fact and conclusions of law. These comprise twenty-two pages of the printed record and go into great detail. It is claimed that the findings are not supported by the evidence viewed in a light most favorable to the plaintiffs and that the court decided the fact issues rather than determining that there were no genuine fact issues.

The proceeding on motion for summary judgment is in the nature of an inquiry in advance of the trial for the purpose of determining whether there is a genuine issue of fact and not for the purpose of determining an issue of fact. Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016; Ramsouer v. Midland Valley R. Co., 8 Cir., 135 F.2d 101.

As a summary judgment presupposes that there is no genuine issue of fact, findings of fact and conclusions of law are not required. It was not the purpose of this rule to require a party to try his case on affidavits with no opportunity to cross-examine witnesses; in fact, only in a rare case can it be determined by affidavit that the evidence available will be such as to entitle the movant, if the case were tried on its merits to a jury, to a directed verdict because there has been no opportunity to cross-examine the witnesses. Here the direct evidence largely relied upon is that of the operator of the bus who was, of course, an employee of the defendant, and the opinion of expert witnesses. In Sartor v. Arkansas Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 727, 88 L.Ed. 967, the trial

court granted motion for summary judgment on the ground that there existed no reasonable basis for dispute as to the facts. On appeal the Supreme Court reversed and in the course of the opinion by Mr. Justice Jackson it is among other things said: "It may be assumed for the purposes of the case that the witnesses offered admissible opinion evidence which, if it may be given conclusive effect, would sustain the motion."

It is then pointed out in the opinion that the witnesses were officers of the defendant or had interests similar to those of the defendant, or were employees of the defendant. After summarizing the features of the motion papers, the court said: .

"The Court of Appeals below heretofore has correctly noted that Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try. * * *

"In considering the testimony of expert witnesses as to the value of gas leases, this Court through Mr. Justice Cardozo has said: 'If they have any probative effect, it is that of expressions of opinion by men familiar with the gas business and its opportunities for profit. But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury * * * or to a judge * * * or to a statutory board.' * * * The rule has been stated 'that if the court admits the testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony.' Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L.Ed. 487. '* * * the jury, even if such testimony be uncontradicted, may exercise their independent judgment.' The Conqueror, 166 U.S. 110, 131, 17 S.Ct. 510, 518, 41 L.Ed. 937. '* * * the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibil-

ity of his testimony to be submitted to the jury as a question of fact.' Sonnentheil v. Christian Moerlein Brewing Co., 172 U.S. 401, 408, 19 S.Ct. 233, 236, 43 L.Ed. 492."

In the instant case the court's findings are based to a considerable extent upon the affidavits of experts and on the testimony of an employee of the defendant. Whatever the weight of the testimony of these witnesses might be on trial a party may not, we think, by resorting to motion for summary judgment supported by affidavits, withdraw his witnesses from cross-examination, the best known method for testing the truthfulness of testimony. Their credibility and the weight to be given to their opinion should be determined on trial in the regular manner. It is apparent from a consideration of the court's findings and conclusions that in determining whether or not there was a genuine issue of fact the court gave no thought to what inferences might reasonably be drawn from the circumstances. The case is largely dependent upon circumstancial evidence. The court also failed to view the evidence, as it should, in a light most favorable to the plaintiffs. For instance, the court found that the bus was passing along the north side of the street and that it passed within eight or ten feet of the boy on the bicycle, whereas the driver of the bus says he was driving along the center of the street, and it appears that the boy, before the accident, was directly ahead of the bus. The court also stressed the fact that there were no marks on the bus, apparently with the thought that if the boy's head had struck against the bus it would have left some mark, but the boy's head was encased in a leather helmet. It is also found that there was no jar from the impact. This, it seems to us, was impossible to determine as the impact, if it occurred, occurred about the time the bus was being swerved to the south and the brakes applied resulting in a great jarring and skidding. How much of this jarring resulted from the brakes and how much resulted from contact with the boy can not be determined. Having in mind the nature and character of the injury to the boy, a jury might, we think, reasonably decline to believe that this could

have resulted from a simple fall to the pavement from a very slowly coasting bicycle, and in view of the physical facts and surrounding circumstances might infer that he was struck by the bus.

On the question of reckless driving and speed the court found that the operator was not guilty of going at an excessive speed and that the speed was only eighteen miles an hour. That was simply an estimate of an interested witness and the driver himself says that the boy was probably scared "when that big bus started whizzing past him." We think it would be for a jury to say whether a bus driven eighteen miles an hour can be said to be "whizzing," and whether or not when the driver attempted to pass this boy he did not accelerate his speed. It is significant too that the witness uses the expression *"started whizzing,"* certainly implying that the bus had not theretofore been "whizzing," and also indicating that the speed was accelerated. This thought is further strengthened by the following testimony of the driver: "I felt sure I had missed the boy because, after all, he was just coasting very slowly and I had my foot on the gas. I was intending to pass him when I seen his bicycle tilt. You don't tarry around when you are passing a bicycle or a kid like that; you either pass now or you stay back of him."

There was also evidence that there were marks of skidding for a distance of some thirty to thirty-eight feet which might have some probative force as to the speed of the bus. And on the question of contact, while the driver says he felt quite certain the bus did not strike the boy, it is observed that he stopped the bus and went back to see what had happened to the boy. Apparently at the time of the accident he was not certain that the bus had not struck the boy.

■ It is conceded that in view of the youth of this boy he could not be charged with contributory negligence. Westman v. Bingham, 230 Iowa 1298, 300 N.W. 525; Webster v. Luckow, 219 Iowa 1048, 258 N.W. 685. The driver of the bus states that before this accident he had observed the boy riding his bicycle in an unsteady manner. In these circumstances a jury might find that reasonable care required that the driver of the bus should have slowed down as he attempted to pass the boy instead of "whizzing past him," as he said he did. Again, if a jury should find the driver negligent in this regard and should believe, as the driver himself surmised, that "he (the boy) lost all sense of motion, balance and everything else when that big bus started whizzing past him," and that because of his frightened or startled condition, superinduced by the negligent act of the driver, injury followed, liability might attach even though there was no actual contact between the bus and the boy. Blessing v. Welding, 226 Iowa 1178, 286 N.W. 436.

■ The burden of proof was upon the movant, not upon the plaintiffs, and all doubts are resolved against the movant. Sprague v. Vogt, 8 Cir., 150 F.2d 795; Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318; American Ins. Co. v. Gentile Bros. Co., 5 Cir., 109 F.2d 732; Rogers v. Great-West Life Assur. Co., 8 Cir., 138 F.2d 474; Blood v. Fleming, 10 Cir., 161 F.2d 292; Ramsouer v. Midland Valley R. Co., supra.

■ Convinced as we are that defendant did not clearly establish that there was no genuine issue of fact involved, the judgment appealed from is vacated and set aside and the cause remanded for further proceedings not inconsistent with this opinion.