SHELBY U.S. DISTRIBUTORS, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SHELBY SUPPLY CO., PROFIT-SHARING TRUST AND/OR U.S. DISTRIBUTORS CO. DIV. PROFIT-SHARING TRUST (DIVISION OF STRATFORD RETREAT HOUSE), PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8855–76, 8856–76.    Filed February 20, 1979.

---

*F. T. Miller, Jr.,* and *H. Morrison Johnston,* for the petitioners.

*Mathew E. Bates,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: .

| Petitioner | Taxable year ending | Deficiency |
| --- | --- | --- |
| Shelby U.S. Distributors, Inc. ...................... | 12/31/71 | $31,908.28 |
| | 12/31/72 | 43,626.74 |
| Shelby Supply Co., Profit-Sharing Trust and/or U.S. Distributors Co. Div. Profit-Sharing Trust (Division of Stratford Retreat House) ...................................... | 3/31/71 | 14,838.35 |
| | 3/31/72 | 12,858.53 |
| | 3/31/73 | 13,331.19 |

The petitioners have conceded that certain determinations of the Commissioner are correct, and the issues remaining for decision are: (1) Whether the trust under an employees profit-sharing plan was operated for the exclusive benefit of the employees within the meaning of section 401(a), I.R.C. 1954,[1] when it invested substantially all its assets in notes and stock of the employer; and (2) whether one of the petitioners is entitled to deduct the amortization of an alleged covenant not to compete.

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Shelby U.S. Distributors, Inc. (Distributors), is a Delaware corporation with its legal address in Shelby, N.C., at the time it filed its petition in this case. Distributors and its wholly owned subsidiary, Shelby Supply Co., Inc. (Supply), filed consolidated corporate Federal income tax returns for the years 1971 and 1972 with the Internal Revenue Service Center, Memphis, Tenn.

The Shelby Supply Co., Profit-Sharing Trust and/or U.S. Distributors Co. Div. Profit-Sharing Trust (Division of Stratford Retreat House) (the trust) maintained its legal address in Shelby, N.C., at the time it filed its petition in this case. The trust operated on a fiscal year basis ending on March 31, and each fiscal year will be identified by the calendar year in which it ends. Since its formation and throughout the tax years in issue, the trust allocated income to the individual participant's accounts and maintained its books and records by use of the cash method of accounting.

The trust was established in 1959 to serve under an employees profit-sharing plan established for the employees of a business then known as Shelby Supply Co. In that year, the Commissioner determined that such plan qualified under section 401(a) and that the trust was exempt under section 501(a).

In 1965, Stratford Retreat House (Stratford), a New York religious corporation, acquired the businesses of Shelby Supply Co. and U.S. Distributors, Inc., and continued to operate them as divisions of Stratford. At the same time, Stratford adopted the profit-sharing plan for the employees of the two businesses.

When Stratford acquired such businesses, it borrowed $200,000 from the trust and gave the trust its secured promissory note for $200,000, with annual interest at the rate of 5¾ percent. At that time, such note constituted 97.66 percent of the trust's assets. On September 16, 1966, Stratford borrowed an additional $75,000 from the trust and gave the trust its secured promissory note for such amount, with annual interest at the rate of 6 percent. After such transaction, the two notes of Stratford constituted 96 percent of the trust's assets. Both notes provided that they would become due "Ninety days after written notice of call for payment" and were secured by the

property, equipment, inventories, leasehold improvements, accounts receivable, and notes receivable of the businesses. At the time of the two loans to Stratford, the trustees of the trust were Dwight K. Street, Ellis P. Monroe, and John D. Griffin, and they continued to serve as trustees of the trust through the years at issue in this case.

On October 6, 1970, Distributors was incorporated, and on October 29, 1970, Distributors entered into a purchase agreement with Stratford, whereby it would purchase all the operating assets and assume all the ordinary business liabilities of the divisions of Stratford known as U.S. Distributors Co. and Shelby Supply Co. Such purchase was consummated on January 4, 1971, and in partial payment therefor, Distributors assumed the two notes totaling $275,000 which Stratford owed the trust. Distributors also assumed a debt Stratford owed to B. J. Goldsmith and Andrew J. Asch in the negotiated amount of $1 million, and it took the assets of the business subject to a recorded security interest in favor of Mr. Goldsmith and Mr. Asch. The trust, Mr. Goldsmith, and Mr. Asch all released Stratford from its notes. At that time, the Stratford notes constituted 47 percent of the trust's assets.

On July 1, 1971, the trust purchased 1,750 shares of newly issued 6-percent preferred stock, $100 par value, from Distributors for $100 per share and paid Distributors $175,000. On that day, the trust also purchased 1,000 shares of 6-percent preferred stock, $100 par value, from Supply for $100 per share and paid Supply $100,000. Prior to that time, neither Distributors nor Supply had issued any preferred stock, and the preferred stock issued to the trust was the only preferred stock issued by Distributors or Supply during the years in issue. Both issues of preferred stock were nonparticipating, nonconvertible, and callable at par. Immediately after the acquisition of such preferred stock, the Stratford notes and such stock had a cost basis to the trust of $550,000 and constituted approximately 95 percent of the trust's assets.

On January 1, 1972, the trust collected an additional contribution from Supply, interest on the notes, and dividends on the preferred stock in the total amount of $102,796.63. Distributors then borrowed $100,000 from the trust and executed a note to the trust with annual interest of 6½ percent and callable 90 days after written call for payment. Such note was secured in the

same manner as the Stratford notes. Thereafter, approximately 96 percent of the trust's assets consisted of notes or preferred stock of Distributors or Supply.

From the time of its incorporation through the years at issue, Distributors had 200 shares of common stock issued and outstanding. Such stock was owned as follows:

| Owner | Number of shares | Owner | Number of shares |
|-------|------------------|-------|------------------|
| D. K. Street | 56 | E. P. Monroe | 48 |
| M. C. Holloman | 48 | J. D. Griffin | 48 |

The owners paid a total of $8,000 for the stock but furnished no other consideration for the acquisition of such stock. Distributors and Supply used a part of the money received from the sale of the preferred stock to the trust to pay off some of their indebtedness to Mr. Goldsmith and Mr. Asch, which had been incurred to enable them to purchase the business from Stratford.

During the years at issue, the trust received the following income:

| | | Return on investments | |
|------|-------------------|--------------------------------------------|-----------------------------------------|
| Year | Investment income | Based on beginning cost basis of investments | Based on ending cost basis of investments |
| 1971 | $36,854.58 | 7.37% | 6.35% |
| 1972 | 33,237.80 | 5.73% | 4.88% |
| 1973 | 34,158.50 | 5.02% | 4.49% |

Sometime in mid- or late–1971, an independent certified public accountant for Distributors and Supply established on Distributors' books an amount of $83,500 as consideration for an alleged covenant by Stratford not to compete with Distributors. The accountant arrived at such amount by allocating to the alleged covenant an excess of $10,443.54 net liabilities Distributors assumed over net assets received, a reserve for bad debts in the amount of $56,152.74 that Stratford had maintained on its books, and an inventory writedown of $16,903.72. He then amortized the covenant over a period of 5 years. However, none of the documents prepared in connection with the purchase of the business from Stratford contained any reference to an agreement not to compete between Distributors and Stratford; nor

was such a covenant bargained for in the negotiations leading to the purchase.

On May 8, 1974, the Commissioner revoked the exemption of the trust effective as of January 1, 1971. The grounds for the revocation were that the trust was not operated for the exclusive benefit of the employees because 96 percent of the assets of the trust were invested in notes and preferred stock of the employer or its parent. In a notice of deficiency to the trust, the Commissioner determined that the trust's income for 1971, 1972, and 1973 was taxable. In a notice of deficiency to Distributors, the Commissioner determined that its contributions to the trust for 1971 and 1972 were not deductible since the trust was not exempt from taxation under section 501(a). He also denied the deductions for the alleged covenant not to compete.

## OPINION

The first issue for decision is whether the trust was operated for the exclusive benefit of the employees within the meaning of section 401(a) during the years in issue. The resolution of this issue will answer the questions of whether the income earned by the trust during the years in issue is taxable and whether Distributors is entitled to deduct its contributions.

Section 401(a) provides, in part:

A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section * * *

Section 501(a) provides that an organization described in section 401(a) is exempt from tax. Section 404(a)(3) provides that contributions to stock bonus and profit-sharing trusts are deductible by the employer if the trust is exempt from tax under section 501(a).

The regulations under section 401(a) set no precise standards and place few restrictions on the investments of a trust established for the exclusive benefit of the employees or their beneficiaries. Section 1.401–1(b)(5)(i) and (ii), Income Tax Regs., states, in part:

(5)(i) No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to

purchase any investments permitted by the trust agreement to the extent allowed by local law. * * *

(ii) Where the trust funds are invested in stock or securities of, or loaned to, the employer or other person described in section 503(b), full disclosure must be made of the reasons for such arrangement and the conditions under which such investments are made in order that a determination may be made whether the trust serves any purpose other than constituting part of a plan for the exclusive benefit of employees. * * *

In 1969, the Commissioner issued Rev. Rul. 69–494, 1969–2 C.B. 88, setting forth his views concerning the investments that can be made by a qualified trust, and in this case, he relies upon the tests set forth in such revenue ruling. Such revenue ruling provides, in part:

The primary purpose of benefiting employees or their beneficiaries must be maintained with respect to investments of the trust funds as well as with respect to other activities of the trust. This requirement, however, does not prevent others from also deriving some benefit from a transaction with the trust. For example, a sale of securities at a profit benefits the seller, but if the purchase price is not in excess of the fair market value of the securities at the time of sale and the applicable investment requisites have been met, the investment is consistent with the exclusive-benefit-of-employees requirement. These requisites are: (1) the cost must not exceed fair market value at time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan, and (4) the safeguards and diversity that a prudent investor would adhere to must be present. * * *

The Commissioner contends that the trust in this case was not qualified because its investments lacked liquidity, diversification, and violated the rule of prudence.

Before the enactment of the Employee Retirement Income Security Act of 1974 (Pub. L. 93–406), 88 Stat. 877 (ERISA), the investments to be made by a qualified trust was a troublesome subject. Historically, such trusts frequently invested their funds in securities of the employer. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 493. However, if the business of the employer did not prosper, the hopes of the employees might be frustrated. When they reached retirement, they might discover that the trust lacked sufficient funds to provide them the promised retirement benefits.

This subject was considered in connection with the enactment of the Internal Revenue Code of 1954. Section 505 of H.R. 8300, as it passed the House of Representatives, would have required a trust to diversify its investments by limiting the amount that

could be invested in any particular security. H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 45–46 (1954); see also p. A169. However, such restrictions were not to apply to investments in securities of the employer.

The restrictions proposed by the House were not included in the legislation as ultimately enacted. The only new limitation adopted by the Congress at that time was to make qualified trusts subject to the prohibited transaction rules of section 503. Under such rules, a trust could continue to invest in the securities of the employer, but the trust lost its exemption if it lent any of its assets to the employer "without the receipt of adequate security and a reasonable rate of interest," if it made a substantial purchase of the employer's securities for "more than adequate consideration in money or money's worth," or if it engaged "in any other transaction which results in a substantial diversion of its income or corpus" to the employer. Sec. 503(b).

In 1962, President Kennedy appointed a committee to study the operation and administration of private pension plans and to make recommendations concerning them. In 1965, the committee presented its final report to President Johnson. In its chapter entitled "Protecting the Interests of Employees in the Investments of Retirement Funds," the President's committee stated that:

> Whatever the type of investments made by retirement funds, such investments should be made honestly, conscientiously, and prudently; the Committee considers it important that there be the greatest practicable degree of assurance on these points. [Public Policy and Private Pension Programs: A Report to the President on Private Employee Retirement Plans by President's Committee on Corporate Pension Funds and Other Private Retirement and Welfare Programs, p. 73 (Jan. 1965).]

Elsewhere, the committee also stated:

> Diversification is a normal concomitant of prudent practice. The question is how to permit broad exercise of discretion on the part of trustees or plan managers but to hold them to the highest standards of fiducial responsibility. Regulations or formulas for asset management would reduce this flexibility without the likelihood of improving the quality of the judgment and discretion exercised by trustees or plan managers. Nor does the limitation of investments to a "legal list," as in the case of savings banks or trust funds under court jurisdiction, seem appropriate in the case of retirement funds. On the basis of present evidence, the Committee does not propose the substitution of a new set of statutory standards for the recognized standards of fiducial responsibility, although there appears to be a need for strengthening statutory provisions for

assuring compliance with these standards. [Public Policy and Private Pension Programs, *supra* at 74.]

Yet, when ERISA was enacted in 1974, it included more specific regulation of investments of trust funds. Section 404(a)(1)(B) of such act establishes a "prudent-man" standard governing investment of employees' funds; section 404(a)(1)(C) of such act requires diversification of such investments; and section 407 of such act places percentage limitations on the amount of employer securities in which a qualified trust may invest. However, such limitations are not applicable to the years at issue in this case. Moreover, although section 407(a) of ERISA generally limits the employer securities that can be held by a qualified plan, such limitation is not applicable to "eligible individual account" plans, as defined in section 407(d)(3)(A) of such act, if such plan explicitly provides for greater investment in such assets. Sec. 407(b), ERISA. Thus, the prudent-man rule and the diversification requirement do not prevent investments in the securities of the employer in such plans. Sec. 404(a)(1)(C) and (2), ERISA.

In summary, it is clear that for many years, qualified trusts have been making substantial investments in securities of the employer and that although Congress and the Treasury Department have been aware of such practice and considered the consequences thereof, they have never decided to prohibit such investments. In 1954, they merely decided to make such investments subject to the "arm's-length" rule of section 503, and it is that law which is applicable to the years in issue in this case. Moreover, even when Congress decided to adopt more particular restrictions on investments as a part of ERISA, it made an exception for the type of plan now before us. Thus, a review of the legislation and legislative history concerning the subject shows that the Commissioner's ruling requiring liquidity, diversity, and adherence to a prudent-man standard for investments as requisites under section 401(a) has not acquired the force of law. Compare *United States v. Correll*, 389 U.S. 299 (1967), and *McMenamy v. Commissioner*, 54 T.C. 1057 (1970), affd. 442 F.2d 359 (8th Cir. 1971).

Nor have the decided cases sustained the position maintained by the Commissioner. In *Feroleto Steel Co. v. Commissioner*, 69 T.C. 97 (1977), the employer established a pension plan for its employees under section 401(a). Two of the three trustees of the

trust which administered the plan were shareholders of the employer. The trustees borrowed money at 4.8-percent interest from the issuer of one of the employee life insurance policies that comprised the assets of the trust. On the same day, the trust lent the money to the largest shareholder of the company at 4.8-percent interest, and the shareholder executed a promissory note for the amount, pledging as collateral all the corporations's class A stock owned by him and his son. He then made a loan of an amount slightly in excess of the amount borrowed from the trust to the employer at 8.5-percent interest. The shareholder did not adhere to the payment schedule for the loan he received from the trust, although he did make some payments to the trust. The Court held that the trustees' actions were contrary to their alleged intention of protecting the trust's assets in that the low interest rate to the shareholder was not in the best interests of the trust and that the loans themselves were prohibited by the trust agreement.

In *Central Motor Co. v. United States,* an unreported case (D. N. Mex. 1976, 37 AFTR 2d 76–1001, 76–1 USTC par. 9245), affd. on this issue 583 F.2d 470 (10th Cir. 1978), the district court stated:

> In exchange for demand promissory notes, virtually all of the trust's assets were loaned to a corporation which was subject to the de facto control of the employer corporation's principal shareholder. The borrowing corporation lacked the financial ability to redeem the notes, and the loans were not adequately secured to protect the employees * * * . Further, the loans were continued over a number of years without any real payment of interest or any substantial repayment of principal. * * * [37 AFTR 2d at p. 76–1003, 76–1 USTC at p. 83, 524.]

The Court held that the trust was not operated for the exclusive benefit of the employees since it did not maintain sufficient liquidity to permit distributions in accordance with the trust instrument, and since the safeguards and diversity of investment to which a prudent investor would adhere were not followed.

In *H. S. D. Co. v. Kavanagh,* 88 F. Supp. 64 (E.D. Mich. 1949), employee trusts invested a large percentage of their assets in stock of the employer corporation. The district court held that the trusts were not exempt because:

> it appears that an employer's stock bonus, pension and profit-sharing plan is not operated for the exclusive benefit of the employees, but as a mere

subterfuge to build up the employer's capital reserves and to provide what are in effect benefits which discriminate in favor of executive officers who are shareholders * * * [88 F. Supp. at 69.]

The Sixth Circuit reversed, holding that a subsequent Commissioner of Internal Revenue had no authority to revoke the exempt status of two employee trusts that had been granted exemption by a previous Commissioner when the taxpayer's operation of the trusts remained unchanged from the time the first exemptions were granted and then later revoked. 191 F.2d 831, 846 (1951). The Circuit Court also declared that there was no evidence that the employer "was diverting its profits in this way for its own benefit, or for the benefit of the executive employees." 191 F.2d at 839.

In *Feroleto* and *Central Motor*, the trusts lost their exemption because of their investment practices, but in each case, the conclusion is justifiable without subjecting the trust to a rule of prudence or a requirement of diversification. In *Feroleto*, the funds of the trust were obviously misused; if interest at the rate of 8.5 percent could be earned on the loan to the employer, then there was no reason for the trust funds to be loaned to the shareholder at only 4.8 percent so that he could make the loan to the employer at the higher interest rate. The obvious inference to be drawn from such situation is that the loan was channeled through the shareholder so that he could make a profit on the loan. In *Central Motor*, although the district court referred to a rule of prudence and a requirement of diversification, the loan was unwise and improper, irrespective of such requirements, because of the lack of security, because the borrower was financially unreliable, and because there were no payments of interest or repayment of principal. In like manner, although the district court in *H. S. D. Co.* held that the investments were not for "the exclusive benefit of his employees" within the meaning of section 401(a), it appears that the court also considered the arrangement to discriminate in favor of a prohibited class.

Moreover, the facts of such cases are clearly distinguishable from those of the case now before us, and such cases do not justify revoking the trust's exemption in this case. Here, the Commissioner has not questioned the ability of Distributors and Supply to fulfill their obligations. The notes were secured and did provide for the payment of interest, and the Commissioner has not questioned the adequacy of such security or the

reasonableness of such interest. In addition, interest payments were in fact made, and in years subsequent to those at issue, payments on principal were made when requested. The Commissioner has not maintained that any of the transactions constituted a prohibited transaction within the meaning of section 503, and there is no reason to believe that any of the investments by the trust did in fact contravene the provisions of such section.

The evidence does show that the funds of the trust were used by the trustees to enable their corporations to purchase the businesses now operated by Distributors and Supply, and that such funds have been used to provide additional capital for the operation of the businesses. Yet, it is recognized that the investments of a trust may result in some benefit to another person without the trust losing its exemption, so long as there is no misuse of the trust funds. See *Feroleto Steel Co. v. Commissioner*, 69 T.C. at 113. Though the employers, their officers, and the trustees may all have derived some indirect benefit from the use of the trust funds, it appears that the trust was also allowed to earn a reasonable return on its investments and that there was no channeling of trust profits into the hands of individuals. Compare *Feroleto Steel Co. v. Commissioner, supra*. Accordingly, we conclude and hold that there was no basis for revoking the trust exemption and that it continued to be exempt during the years at issue. As a result, the income of the trust is exempt from taxation, and the contributions to it during the years at issue are deductible.

In his brief, the Commissioner, for the first time, raised the argument that the trust failed to comply with section 1.401–1(b)(5)(ii), Income Tax Regs., which requires that the trust disclose any investments in stocks or securities of, or loans to, the employer. It is well settled that issues raised for the first time on brief will not be considered, when to do so prevents the opposing party from presenting evidence that he might have if the issue had been timely raised. *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973); *Riss v. Commissioner*, 56 T.C. 388, 401 (1971), Supplemental Opinion 57 T.C. 469 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973); *Theatre Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958). Accordingly, we have not considered this argument by the Commissioner because it was not timely raised.

The second issue to be considered is whether Distributors is

entitled to amortize and deduct the alleged cost of the covenant not to compete. The Commissioner contends that the deductions for the amortization of such covenant are not allowable because Distributors did not establish that it acquired any such covenant from Stratford, or if acquired, that the value of the covenant is inseparable from the total purchase price. On the other hand, Distributors contends that its accountant deduced from the purchase agreement that a no-compete agreement was properly includable under the terms and conditions of goodwill.

This Court has held that if a covenant not to compete is separable from the other assets bargained for, if a severable consideration for it can be shown, and if the covenant has economic reality, then the purchaser is entitled to amortize the price paid for the covenant over its life. *Levinson v. Commissioner*, 45 T.C. 380, 389 (1966). However, this Court has also held that:

Where a taxpayer has entered into a written agreement * * * that provides for the specific terms of a transaction the tax consequences of which are in issue, we have applied the rule that "strong proof" must be adduced by the taxpayer if he seeks to establish a position at variance with the language of the agreement to which he was a party. * * * [*Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972).]

Distributors has stipulated that none of the documents prepared in connection with its purchase of the business from Stratford contained any reference to an agreement not to compete. It is well settled that where no separate consideration for a covenant not to compete is provided for in the purchase and sale agreement, a purchaser cannot "unilaterally attribute part of the purchase price to the covenant and amortize the cost over its term, without 'strong proof' that the parties intended to attribute that separate value to the covenant." *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118, 119 (1st Cir. 1972), affg. a Memorandum Opinion of this Court. Under such cases, we must disallow Distributors' deductions for the alleged covenant, for it has introduced no evidence, much less the "strong proof" required, that it and Stratford *intended* to allocate a separate value to the covenant. Distributors conceded that no document prepared in connection with the purchase of the business from Stratford contained any reference to an agreement not to compete, and it offered no evidence that any of the negotiations conducted prior to the actual purchase from

Stratford included any such reference or that any amount was intended to be allocated thereto. In fact, Distributors' accountant testified that "the no compete which we put on the books was an afterthought so far as the original document being drawn was concerned."

This case is distinguishable from *Kinney v. Commissioner*, 58 T.C. 1038 (1972). In that case, the Court found that the purchase agreement contained a covenant not to compete and that the parties were simply unable to agree on the amount of the purchase price to be allocated to the covenant. Here, we have no evidence indicating that the parties did in fact agree upon a covenant. Accordingly, we hold that Distributors is not entitled to any deduction for the alleged cost of the covenant not to compete.

*Decisions will be entered under Rule 155.*