FEROLETO STEEL COMPANY, INC.; THE ESTATE OF FRANK FEROLETO, DECEASED, HELEN M. FEROLETO, FRANCIS V. FEROLETO, JR., AND GEORGE J. FEROLETO, EXECUTORS; HELEN FEROLETO; ARTHUR J., JR., AND ANITA CROTEAU; ORVILLE AND RUTH POWELL; GEORGE EVANCHICK; CHRIS AND MARGUERITE KIOSSE; LAWRENCE AND CHARLOTTE VARHOLAK; THOMAS AND LILLIAN DUNN; FRANCIS V., JR., AND ELEANOR FEROLETO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8731–74.    Filed October 25, 1977.

*Stanley N. Bergman* and *David E. Richheimer,* for the petitioners.

*John O. Tannenbaum,* for the respondent.

SCOTT, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Tax year ended | Deficiency |
|---|---|---|
| Feroleto Steel Co., Inc. | 9/30/70 | $2,600.21 |
| | 9/30/71 | 1,430.88 |
| Frank and Helen M. Feroleto | 12/31/69 | 84,368.01 |
| | 12/31/70 | 11,069.12 |
| | 12/31/71 | 4,756.88 |
| Francis V., Jr., and Eleanor Feroleto | 12/31/70 | 1,782.90 |
| | 12/31/71 | 1,426.10 |
| Arthur J., Jr., and Anita Croteau | 12/31/70 | 226.81 |
| Orville and Ruth Powell | 12/31/70 | 365.50 |
| | 12/31/71 | 390.24 |
| George Evanchick | 12/31/70 | 219.00 |
| Chris and Marguerite Kiosse | 12/31/70 | 347.99 |
| | 12/31/71 | 94.50 |
| Lawrence and Charlotte Varholak | 12/31/70 | 339.34 |
| | 12/31/71 | 363.28 |
| Thomas and Lillian Dunn | 12/31/70 | 264.16 |
| | 12/31/71 | 245.30 |

The following issues are presented for decision:

(1) Whether the trust forming part of the employees' pension plan of Feroleto Steel Co., Inc. (hereinafter Feroleto Steel or the corporation), lost its qualified status under section 401(a), I.R.C. 1954,[1] for taxable years 1970 and 1971, as the result of a loan from the pension plan to the majority shareholder of the corporation, Frank V. Feroleto, and a subsequent loan from Mr. Feroleto to the corporation; and

(2) Whether under sections 402(b) and 72(e) the full amount of the loan from the pension trust to Mr. Feroleto is taxable to him in 1969 as a distribution from a nonexempt trust.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Feroleto Steel Co., Inc., is a Connecticut corporation which, at the time it filed the petition in this case, had its principal place of business in Bridgeport, Conn. The corporation, an accrual basis taxpayer with a fiscal year ending September

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.

30, filed its Federal corporate income tax returns for the taxable years ended September 30, 1970, and September 30, 1971, with the Director of the Internal Revenue Service Center at Andover, Mass.

Petitioners Frank V. Feroleto and Helen M. Feroleto resided in Trumbull, Conn., at the time the petition in this case was filed. On April 2, 1977, after trial of this case, Frank V. Feroleto died. The Estate of Frank V. Feroleto, Helen M. Feroleto, Francis V. Feroleto, Jr., and George J. Feroleto, executors, has been substituted for petitioner Frank V. Feroleto

Petitioners Francis V. Feroleto, Jr., and Eleanor M. Feroleto resided in Fairfield, Conn., at the time the petition in this case was filed.

Petitioners Arthur J. Croteau, Jr., and Anita L. Croteau resided in Milford, Conn., at the time the petition in this case was filed.

Petitioners Orville P. Powell and Ruth L. Powell resided in Easton, Conn., at the time the petition in this case was filed.

Petitioners Chris Kiosse and Marguerite Kiosse resided in Trumbull, Conn., at the time the petition in this case was filed.

Petitioners Lawrence M. Varholak and Charlotte A. Varholak resided in Bridgeport, Conn., at the time the petition in this case was filed.

Petitioners Thomas T. Dunn and Lillian M. Dunn resided in Bridgeport, Conn., at the time the petition in this case was filed.

All of the above-mentioned individual petitioners filed joint Federal income tax returns for the years in issue with the Director of Internal Revenue Service Center in Andover, Mass.

Petitioner George Evanchick resided in Bridgeport, Conn., at the time the petition in this case was filed. He filed his individual Federal income tax return for 1970 with the Director, Internal Revenue Service Center, Andover, Mass.

The Feroleto Steel Co., Inc., was incorporated in 1959. During the taxable years in issue, the corporation's capital stock consisted of 1,000 shares of class A voting common stock and 1,000 shares of class B nonvoting common stock. Frank V. Feroleto owned 700 of the class A shares; his son, Francis V. Feroleto, Jr., owned the remaining 300 shares. Frank V. Feroleto also owned 700 shares of the class B nonvoting common stock; his wife, Helen Feroleto, owned the remaining 300 shares of the class B stock.

The corporation adopted the Feroleto Steel Co., Inc., Employees Pension Plan on September 27, 1961. By letter dated January 30, 1962, Feroleto Steel was informed by the Internal Revenue Service that its employee pension plan had been found to be qualified under section 401(a) and that the trust forming part of the plan was exempt from tax under section 501(a).

The pension plan was designed with the assistance of Ralph Smith. Mr. Smith was an insurance agent who specialized in the field of fully insured pension plans. Among the insurance companies Mr. Smith represented was Seaboard Life Insurance Co. of America (Seaboard).

The Feroleto Steel employee pension plan is a defined benefit plan, providing a normal retirement benefit equal to 30 percent of each participant's compensation in the form of a life annuity with 120 certain monthly payments. Section 6.1 of article VI of the plan provides:

The Retirement Benefit for each Participant shall be provided by the purchase of suitable endowment income insurance policies or deferred annuity contracts issued by a life insurance company authorized to do business in the State of Connecticut of a type comparable to the Retirement Income Policies and Deferred Income Contracts issued by the Seaboard Life Insurance Company of America.

The plan provides that these insurance policies or annuity contracts are to be purchased in such amounts as will fund each participant's normal retirement benefit as of his normal retirement date. "Normal retirement date" is defined by the plan as the anniversary of the date of adoption of the plan nearest a participant's 65th birthday or nearest the date of completion of 10 years of service under the plan, whichever comes later.

The plan provides for 50-percent vesting after 5 years of participation with an additional 10-percent vesting in each subsequent year, so that each participant's interest would be fully vested after 10 years of participation in the plan.

Article IV of the plan provided for administration of the plan by three trustees appointed by the Feroleto Steel board of directors. The original trustees of the plan, serving from the time of its inception through September 30, 1971, were petitioners Frank V. Feroleto and Francis V. Feroleto, Jr., and Arnold Bernstein, C.P.A.

Section 4.2 of article IV confers the following powers on the trustees:

The Trustees shall supervise and control the operation of this Plan in accordance with its terms. They shall have all powers necessary to accomplish that purpose including, but not by way of limitation, the following:

a. To construe this Plan.

b. To determine all questions of eligibility.

c. To compute retirement benefits.

d. To determine the plan and amount of life insurance or annuity contract to be applied for on the life of an eligible Employee.

e. To compute the cost of the plan and to make all disbursements.

f. To borrow on the policies to pay premiums in accordance with the provisions of Section 8.3 of Article VIII.

g. To determine any question of the rights of a terminated Employee or of a Terminated Participant in the policy or contract on his life, and to make a disposition thereof.

h. To determine any question of the amount of benefits payable on retirement and to obtain the type of contract for this purpose and to make a disposition thereof.

i. To determine the rights of Participants in event of termination of the Plan and to make a disposition of Trust Assets.

Section 8.3 of article VIII sets forth the trustees' powers with respect to borrowing on the insurance policies:

If at any time the funds furnished by the Employer together with any amount on deposit in the Suspense Account, are not sufficient to pay the premiums and any loan interest less dividends, the Trustees shall apply for policy loans to pay such premiums provided, however, that (a) such loans shall be made on the basis of a uniform percentage of the premiums and loan interest due on all policies having sufficient cash value for that purpose and shall be made to the extent of the value available on all other; (b) any such loan shall be applied exclusively to payment of the premium and loan interest due on the policy on which it was granted; (c) the amount of such loan shall not be in excess of the increase in the available loan value of the policy which results from such premium payment; (d) sufficient funds are furnished by the Employer to pay the balance of the amount due the Insurance Company on all policies and contracts; and (e) that so long as any such loan is outstanding the Employer agrees to supplement the Death Benefit by a payment equal in amount to the loan on policy of the deceased Employee.

Pursuant to article XII of the plan, all money received by the trustees was to be maintained in a suspense account:

### SUSPENSE ACCOUNT

12.1 Any funds coming into the hands of the Trustees whether from the Employer, the Insurance Company or a Participant shall be held in an account to be known as the Suspense Account.

12.2 Any funds on deposit in the Suspense Account shall be used solely for payment of benefits to Terminated Participants and to pay premiums on policies and contracts held under the trust which come due in the year the funds

are received or in the next succeeding year, provided, however, that no disbursements shall be made from the account except on the instructions of the Trustees.

12.3 Upon termination of the Trust and/or Plan, the Trustees shall subject to the provisions of Article XVI, dispose of any funds on deposit in the Suspense Account by dividing such funds among the remaining Active Participants in the proportion that the annual premium of the policy or contract held on the life of each such Participant entitled to share bears to the total annual premium of the policies or contracts held on the life of all such Participants.

Section 17.4 of article XVII provides:

It shall be impossible at any time prior to the satisfaction of all liabilities with respect to Participants and their Beneficiaries under its plan, for any of the trust assets to be used for, or diverted to, purposes other than for their exclusive benefit and the benefit of their beneficiaries; and the Employer shall not be entitled to receive back any part of its payments.

From the plan's inception in 1962 until July of 1969 the trustees purchased endowment life insurance policies on the lives of the participants from Seaboard. The trustees were the owners of these policies. When a participant retired, it was contemplated that the insurance policy on his life would be converted to cash and an annuity providing the stated pension benfits would be purchased.

Prior to July 1, 1969, Ralph Smith informed the trustees that Seaboard was experiencing financial difficulties. Through a telephone conversation with the Connecticut Insurance Commissioner, Mr. Smith had learned that there was outstanding against Seaboard a "Cease and Desist" order prohibiting Seaboard from writing new insurance policies in the State. Mr. Smith contacted the trustees of the Feroleto Steel plan and recommended that they take measures to safeguard their investments in Seaboard insurance policies because of Seaboard's questionable financial condition. It was Mr. Smith's understanding that the cash surrender values of the policies the plan had taken out with Seaboard would not be protected in the event of the insurance company's insolvency. Specifically, Mr. Smith suggested to the trustees that they borrow from Seaboard the loan value of the largest policy. Mr. Smith continued to represent Seaboard and, other than when restricted by the cease and desist order, wrote insurance for some of his clients with Seaboard. The policy procured under the Feroleto Steel pension plan with the largest cash surrender value was that of Frank V. Feroleto. The loan value of this policy (95 percent of cash surrender value) was

$114,927.88. The total cash surrender value of all the insurance policies funding the pension plan at that time was $173,026.

With the assistance of Mr. Smith, the trustees executed a policy loan application and, on July 8, 1969, they borrowed from Seaboard the sum of $114,927.88, the loan value of Frank V. Feroleto's policy. The terms of the loan required payment of interest by the pension plan at the rate of 4.8 percent per annum. The trustees and Mr. Smith decided to borrow only on the policy of Frank V. Feroleto rather than on all the policies. The trustees believed that the loan value of Frank V. Feroleto's policy was approximately equal to the amount of the vested interests of all participants of the plan.

On the same day that it received the loan proceeds from Seaboard, the pension plan loaned these loan proceeds of $114,927.88 to Frank V. Feroleto. Francis V. Feroleto, Jr., one of the three trustees, had participated in the decision to borrow on Frank V. Feroleto's policy, but he did not participate in the decision to loan the proceeds of this borrowing to Frank V. Feroleto. Frank V. Feroleto executed a promissory note in the amount of the loan. The note provided for nine semiannual payments of $11,493 on January 8 and July 8 of each year, commencing January 8, 1970, with interest at 4.8 percent per annum.[2] In addition, Mr. Feroleto agreed to pledge as collateral all of the corporation's class A stock. Helen Feroleto and Francis V. Feroleto, Jr., cosigned the note.

As indicated by the August 1969 Federal Reserve Bulletin, the prevailing interest rates during the week ended July 12, 1969, were as follows:

| Type of obligation | Prevailing interest rate (percent) |
| --- | --- |
| Prime commercial paper, 4 to 6 months | 8.75 |
| Finance company paper, placed directly, 3 to 6 months | 7.81 |
| Prime bankers' acceptances, 90 days | 8.50 |
| Federal funds rate | 9.07 |

---

[2]Providing for only nine semiannual payments was apparently a mistake. It would require 10 payments to fully repay the loan. In any event, the loan was subsequently repaid in full.

*U.S. Government securities*

| 3–month bills | | 6–month bills | | 9– to 12–month issues | |
|---|---|---|---|---|---|
| *Rate on new issue* | *Market yield* | *Rate on new issue* | *Market yield* | *Market yield* | *Other* |
| 7.069 | 6.94 | 7.309 | 7.19 | 7.08 | 7.67 |

The rates of interest in the State of Connecticut at savings banks and commercial banks during July 1969 were 5 percent and 4.5 percent per annum, respectively, compounded quarterly.

At some time in July 1969, after receiving the loan from the pension plan, Frank V. Feroleto made an unsecured loan to Feroleto Steel in the amount of $125,000 with interest at 8.5 percent per annum.

Mr. Feroleto did not adhere to the payment schedule set forth in his promissory note to the pension plan. He did, however, make the following repayments:

| *Date of repayment* | *Repayments of principal* | *Payments of interest* |
|---|---|---|
| Oct. 9, 1970 | $23,809.07 | $4,117.48 |
| Mar. 31, 1971 | 0 | 1,529.60 |
| Dec. 28, 1971 | 91,118.81 | 3,937.50 |
| | 114,927.88 | 9,584.58 |

Feroleto Steel made the following repayments with respect to the loan to the corporation by Mr. Feroleto:

| *Date of repayment* | *Repayments of principal* | *Payments of interest* |
|---|---|---|
| Dec. 1969 | 0 | $2,656 |
| Dec. 1970 | 0 | 10,625 |
| Dec. 28, 1971 | $125,000 | 10,625 |
| | 125,000 | 23,906 |

Late in 1971 the trustees asked Mr. Smith to ascertain from Seaboard the amount of repayment of the loan and the possibility of repaying the loan over a period of four quarters. Mr. Smith wrote the insurance company regarding a repayment schedule, but he advised the trustees not to repay the loan to Seaboard, as he understood that another "Cease and Desist" order had been issued against the insurance company. On or shortly after December 28, 1971, the trustees drew out the cash surrender value of all the policies of Seaboard which they owned

and invested the amount received in policies with Massachusetts Mutual Insurance Co.

During its taxable years ended September 30, 1970, and September 30, 1971, Feroleto Steel made contributions to the pension plan of $33,874 and $18,200, respectively. Of the amount contributed for the taxable year ended September 30, 1970, $5,159.89 represents forfeitable, nonvested contributions. Of the amount contributed for the taxable year ended September 30, 1971, $2,981 represents forfeitable, nonvested contributions.

The following amounts represent the nonforfeitable, vested contributions made on behalf of the plan participants by the corporation for the years indicated:

|  | 1970 | 1971 |
|---|---|---|
| Frank Feroleto | $15,080.20 | $7,500 |
| Helen Feroleto | 2,693.59 | 735 |
| Arthur J. Croteau | 965.19 | 0 |
| Orville Powell | 1,104.15 | 1,184 |
| George Evanchick | 988.51 | 0 |
| Chris Kiosse | 681.67 | 0 |
| Marguerite Kiosse | 675.94 | 400 |
| Lawrence Varholak | 1,174.89 | 1,020 |
| Thomas Dunn | 1,169.58 | 1,115 |
| Francis V. Feroleto, Jr | 4,180.39 | 3,265 |

Seaboard stayed in business until 1975, when it became bankrupt and ceased to operate.

Frank V. Feroleto became 65 years old on September 25, 1969. On September 27, 1971, he completed 10 years of service under the Feroleto Steel pension plan; consequently, his interest became fully vested as of that date.

Respondent determined that the loan by the pension plan to Mr. Feroleto was not for the exclusive benefit of employees within the meaning of section 401(a). Alternatively, he determined that the loan from the pension plan to Mr. Feroleto followed by the loan from Mr. Feroleto to the corporation was a prohibited transaction within the meaning of section 503(b)(1) and (6). In either case, he determined that as a result of the loan transactions the Feroleto Steel employees' pension plan was no longer qualified under section 401(a) and the trust was no longer exempt from tax under section 501(a). Accordingly, he disallowed Feroleto Steel's deductions for the amounts of the

forfeitable contributions to the nonexempt trust and included these amounts in the corporation's taxable income for the taxable years ended September 30, 1970, and September 30, 1971, pursuant to section 404(a)(5). In addition, respondent determined that for calendar years 1970 and 1971 each of the participants' incomes should be increased by the amount of the nonforfeitable, vested contributions on his behalf to the nonqualified pension plan pursuant to sections 402(b) and 83.

With respect to taxable year 1969 respondent determined that the $114,927.88 in loan proceeds received by petitioner Frank V. Feroleto from the pension plan was a distribution from a nonexempt trust, fully includable in the taxable income of petitioners Frank V. Feroleto and Helen M. Feroleto pursuant to sections 402(b) and 72(e). This sum represents more than 25 percent of the gross income shown on the 1969 return of Frank V. Feroleto and Helen M. Feroleto. Consequently, respondent determined that assessment and collection of the deficiency for 1969 were not barred when the notice of deficiency to Frank V. Feroleto and Helen M. Feroleto was mailed, because the 6-year statute of limitations for assessment provided in section 6501(e)(1)(A) was applicable.

OPINION

Section 401(a) provides:

(a) REQUIREMENTS FOR QUALIFICATION.— A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section —

*      *      *      *      *      *      *

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries;

While the statute sets forth the requirements which must be met by the "trust instrument," the regulations are clear that "The law is concerned not only with the form of a plan but also with its effects in operation." Sec. 1.401–1(b)(3), Income Tax Regs. In cases involving whether a plan discriminates in contributions or benefits under section 401(a)(4), this regulation has been cited with approval. *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 174–175 (1976).

The phrase "purposes other than for the exclusive benefit of his employees or their beneficiaries" as used in section 401(a)(2) is defined by section 1.401–2(a)(3), Income Tax Regs., to include "all objects or aims not solely designed for the proper satisfaction of all liabilities to employees or their beneficiaries covered by the trust."

The Code sets forth no specific rules regarding the types of investments which might be considered a use of funds for or diversion of funds to purposes not for the exclusive benefit of employees or their beneficiaries. Section 1.401–1(b)(5)(i), Income Tax Regs., provides that "Generally, the contributions may be used by the trustees to purchase any investments permitted by the trust agreement to the extent allowed by local law." The only case to which our attention has been directed or that we have found applying the exclusive benefit rule in the context of trust investments is *Central Motor Co. v. United States*, F. Supp. (D. N.M. 1976, 37 AFTR 2d 76–1001, 76–1 USTC par. 9245).[3] In that case the court found that a trust forming part of an employee plan lost its qualified status because the trust's investments in inadequately secured demand notes of another corporation controlled by the employer were not for the exclusive benefit of the employees. The court reasoned that the "primary purpose of benefitting employees or their beneficiaries must be maintained with respect to investments of the trust funds as well as with respect to other activities of the trust."[4] We agree with this reasoning in the *Central Motor Co.* case.

After considering all the facts and circumstances herein we have concluded that the loan to the trustees of the loan value of the policy on Mr. Feroleto's life and the subsequent loan to Mr. Feroleto were a diversion of the trust assets for a purpose other than the exclusive benefit of the employees or their beneficiaries in contravention of section 401(a)(2). Admittedly, under section 17.4 of article XVII of the plan, diversion was in fact precluded.

[3]The case of *Time Oil Co. v. Commissioner*, 26 T.C. 1061 (1956), remanded 258 F.2d 237 (9th Cir. 1958), involved the exclusive benefit rule in a different context.

[4]See also Rev. Rul. 73–380, 1973–2 C.B. 124, and Rev. Rul. 73–282, 1973–2 C.B. 123.

In the recent case of *Jobusch v. Commissioner*, 68 T.C. 929 (1977), we held that granting the privilege of borrowing from the trust to highly paid officers who were the principal shareholders and to the corporation, but not to other employees, caused the trust to lose its qualification, since the borrowing privilege was considered a benefit discriminatively granted only to members of the prohibited group in violation of sec. 401(a)(4). The issue involved under sec. 401(a)(4) in the *Jobusch* case is not identical to the issue of whether a loan to a major shareholder causes the trust to be disqualified under sec. 401(a)(2).

Nevertheless, in our view under the provisions of section 1.401–1(b)(3), Income Tax Regs., we must look not only to the provisions of the trust instrument but also to the operation of the trust by the trustees. On this record we find that the Feroleto Steel Employees Pension Plan and Trust were not qualified under section 401(a) for taxable years 1970 and 1971 as a result of the loan transactions.

Three factors support our conclusion that the loan transactions were not for the exclusive benefit of the Feroleto Steel employees. First, from this record we find that the trustees' actions are inconsistent with their alleged primary intention of safeguarding the plan's investments in Seaboard insurance policies. Had the trustees really been motivated by the desire to protect their investments, in our view they would have taken measures above and beyond the mere borrowing of the loan value of only one insurance policy. Secondly, the low interest rate charged Mr. Feroleto and the substantial economic benefits he reaped as a result thereof indicate that benefiting the coporation's principal shareholder was a major purpose underlying these loan transactions. Thirdly, we find that these loans were prohibited by the terms of the plan itself and so were not for the employees' exclusive benefit within the provisions of the statute and regulations.

Petitioners' primary argument in response to respondent's contention that the loans violated the exclusive benefit rule is that the transactions were motivated by the trustees' desire to protect their investments on behalf of Feroleto Steel employees in insurance policies of a company experiencing serious financial difficulties. Two of the trustees testified that Seaboard's financial troubles motivated their decision to borrow the loan value of Mr. Feroleto's policy. Neither of these trustees offered any satisfactory explanation as to why lending the proceeds of this loan to Mr. Feroleto at a low interest rate was for the benefit of the Feroleto Steel employees. Nor did either of the trustees offer any satisfactory explanation of why only the proceeds of one policy were borrowed if there were serious questions as to the financial condition of Seaboard.

The two trustees of the plan who testified and Ralph Smith, adviser to the corporation with respect to the plan, all testified that they decided to borrow only the loan value of the policy covering Mr. Feroleto because it constituted the majority of the

trust assets. They testified that they did not want to borrow on the policies covering the lives of the other plan participants because they did not want to alarm them about the security of their interests in the pension plan. Aside from the policy covering the life of Frank V. Feroleto, the two insurance policies with the highest cash surrender values were those covering Helen Feroleto and Francis V. Feroleto, Jr. It would have been quite easy for the trustees to borrow from Seaboard the loan values of these policies without alarming the rank and file Feroleto Steel employees. Neither of the trustees who testified offered a reasonable explanation as to why this was not done if the trustees felt the trust funds were endangered if they remained with Seaboard. After the trustees borrowed on Mr. Feroleto's policy, some $58,000 in trust assets remained with Seaboard. Had the trustees been as concerned about the security of their investments with Seaboard as they purport to have been, in our view they would have maximized their protection by at least borrowing on the policies covering Mrs. Feroleto and Francis V. Feroleto, Jr. Moreover, by the terms of the plan the trustees were the owners of all the policies on the participants' lives. Consequently, if Seaboard's financial situation was so precarious that it was necessary to take immediate measures to temporarily safeguard their investments in Seaboard policies, in all likelihood the trustees could have gone ahead and borrowed the loan value of all the policies without informing the other participants.

A second reason advanced by petitioners for having borrowed the loan value on only one policy was that the loan value of that policy was approximately equal to the vested interests of all the plan participants. The amount of the vested interest of all employees as of July 1969 could have been readily proved from the records of the trust and Feroleto Steel. Other than statements by the trustees that this was the case, however, no evidence was presented showing that the loan value of the policy on the life of Frank V. Feroleto approximated the vested interests of all the plan participants. Moreover, no reason was given by the trustees as to why they would not want to protect the nonvested portions of their investments in Seaboard policies as well as the vested portions. Certainly, their duty as trustees required that they protect all the trust investments.

A second factor that demonstrates that the loan transactions were not for the exclusive benefit of the corporation's employees

is the low rate of interest (4.8 percent) on the loan by the trustees to Mr. Feroleto. Given the prevailing rates of interest during the week ended July 12, 1969, we find that 4.8 percent is an unreasonably low rate of interest. The trustees contended that this rate of interest was reasonable because it was the same rate of interest that Seaboard paid on the funds the trustees invested in its policies. The actuary who had determined the proper amount of Feroleto Steel's contributions to the plan had assumed that the policies funding the plan would earn interest at this rate. Investment of the loan proceeds at a higher rate, petitioners allege, would have necessitated a new and expensive actuarial recomputation. We find, however, that no new actuarial study would have been necessary with regard to the trust funds temporarily invested at a higher rate of interest. Rather, the excess amount received as interest could have been held by the trustees in the suspense account pursuant to article XII of the plan and used by the trustees for subsequent premium payments. Petitioners argue that to have done this would not have benefited the employees but only the employer. In this contention they overlook the benefit to the employees of the extra security of having funds on hand for the premium payments. Such extra funds might well have at some time avoided the necessity of the trustees having to borrow on the policies to pay premiums in accordance with the provisions of section 8.3 of article VIII of the plan. No witness was able to explain why provision for a suspense account was needed if the plan did not contemplate the deposit of funds into the account.

Nor are we willing to overlook the substantial benefits derived by Mr. Feroleto as a result of these loan transactions. The trustees loaned the proceeds of the loan to Mr. Feroleto at an annual interest rate of 4.8 percent. He in turn loaned these funds, together with some additional money of his own, to the employer corporation at 8.5-percent interest. On their joint individual income tax returns for 1969, 1970, and 1971 Frank and Helen Feroleto listed the sums of $2,656, $10,625, and $13,625, respectively, as interest income from Mr. Feroleto's loan to the corporation. A substantial part of this interest income resulted from Mr. Feroleto's ability to charge the corporation an interest rate which was reasonable but which was appreciably higher than the interest rate charged by the trustees on their loan to him. Moreover, Frank and Helen Feroleto's returns for 1969,

1970, and 1971 reveal no reported dividend income from Feroleto Steel. By loaning funds to his corporation at a higher interest rate than that charged him, Mr. Feroleto was able not only to derive substantial amounts of interest income but also to confer an interest expense deduction on the corporation. Had the corporation paid dividends instead, no deduction would have been allowed.

Mr. Feroleto, Sr., was too ill at the time of trial to testify and has since died. We therefore do not have the benefit of his own statements of his considerations in approving the borrowing by the trustees of the loan value of his policy and lending the proceeds to him at an interest rate of 4.8 percent. Mr. Feroleto, Jr., testified that while he participated in the decision to borrow the funds from Seaboard, he did not participate in the decision to lend the funds to his father. The other trustee in his testimony did not explain the basis for the decision to lend the funds to Mr. Feroleto, Sr. However, some of his testimony explaining a statement he had made to the respondent's representatives with respect to Mr. Feroleto's inability to meet his repayment schedule is revealing. This witness testified that although Mr. Feroleto was a man of substantial wealth he was at the time extremely short of cash assets. This testimony suggests that the decision to lend the proceeds of the loan from Seaboard to Mr. Feroleto may well have been prompted by his lack of available cash when he desired to make a loan to the corporation. It further suggests that this need for cash by Mr. Feroleto might have influenced the borrowing of the cash surrender value of his policy by the trustees instead of their immediately finding another company with which to place the policies as they did in December 1971. From the testimony of Mr. Francis V. Feroleto, Jr., it is clear that the views of Mr. Feroleto, Sr., carried great weight with the other two trustees. From this record we conclude that the possibility of garnering substantial economic benefits for Mr. Feorleto, Sr., was an important factor underlying the trustees' decisions to make these loans.

A third basis for our conclusion that these loans were not for the exclusive benefit of the employees is the fact that these transactions were not permitted by the trust agreement as required by section 1.401–1(b)(5)(i), Income Tax Regs. While it is true that the general powers conferred on the trustees by section 4.2 of article IV of the plan were broad, it appears to us that the

specific provisions of section 8.3 of article VIII were intended to narrowly limit the trustees' powers with respect to policy loans. That section provides that the trustees may apply for policy loans whenever the funds furnished by the corporation are insufficient to pay premiums and loan interest and that "any such loan shall be used *exclusively* to [sic] payment of the premium and loan interest due on the policy on which it was granted." [Emphasis added.] No provision of the plan sanctions a loan like the one made to Mr. Feroleto. At trial, trustee Arnold Bernstein admitted that the trust instrument did not confer on the trustees the power to engage in a transaction like the one involved herein. He stated that the trustees nevertheless proceeded to borrow on Mr. Feroleto's policy because they did not want to "let Seaboard go down the drain and lose our money." As we have indicated above, while we do not doubt that the trustees were concerned about the financial condition of Seaboard, we do not consider the record as a whole to support a conclusion that their fear of Seaboard's financial collapse was the compelling reason for the loans they made. Had the trustees realistically been in fear of Seaboard's imminent failure, they would have taken further steps to protect their entire investment in Seaboard policies.

Citing *Time Oil Co. v. Commissioner*, 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956), petitioners contend that disqualification of an employee plan under the exclusive benefit rule is appropriate only when there is a showing that the benefits to be received by the beneficiaries were somehow prejudiced. Petitioners argue that because the employees' benefits under the plan were not jeopardized by the transactions involved herein, the rule has not been contravened. The court in *Time Oil* characterized the deviations from the plan involved in that case as "de minimis" specifically pointing out that no interest advantage inured to the employer since the preferred stock substituted for the non-interest-bearing notes was backdated to the date of the notes. Here, by contrast, the deviations were not de minimis and they were specifically prohibited by the terms of the plan. Also, here the major stockholder of the employer did derive substantial benefits from the deviations. Petitioners' argument to the effect that the exclusive benefit rule is not violated unless the ultimate result of the transaction is that employee benefits are adversely affected would leave trustees

free to engage in virtually any transaction with trust assets, no matter how insecure or speculative, unless as the result of such transactions there were in fact a dilution of employee benefits. Such a narrow construction of the exclusive benefit rule is unwarranted. The intent of that rule is to protect the fund from unauthorized transactions, whether or not those transactions actually result in a loss of benefits to the employee.

By our holding here, we do not mean to imply that the exclusive benefit rule is contravened whenever a benefit inures to someone other than the employees or their beneficiaries as the result of an investment of the funds of an employee trust. However, under the facts of this case the benefit to the third party is not merely an incidental side effect of an investment of trust assets, but is rather a major purpose of the investment. In these circumstances, we hold that the exclusive benefit rule has not been followed. Accordingly, we find that for the taxable years 1970 and 1971, the Feroleto Steel Co., Inc., Employees Pension Trust was not qualified under section 401(a) and not exempt from tax under section 501(a). It follows that the participants' taxable incomes must be increased in each of these years by the amount of the corporation's contributions to the trust on their behalves to the extent that these contributions are vested and nonforfeitable, pursuant to sections 402(b) and 83. Also, pursuant to section 404(a)(5), the corporation's deductions for contributions to the nonexempt trust must be disallowed to the extent they are forfeitable and not includable in the employees' incomes.

Having concluded that the loan to the trustees and the subsequent loan to Frank Feroleto were not undertaken for the exclusive benefit of the Feroleto Steel employees, we need not consider respondent's alternative arguments that the loan to Mr. Feroleto was a prohibited transaction under section 503.

The basis of respondent's argument that the loan in 1969 by the trustees to Mr. Feroleto was a premature distribution to him by the pension plan, fully taxable in the year of receipt under section 402(b), is unclear. In the notice of deficiency respondent referred to the loan being from a nonexempt trust but on brief argues his contention with respect to a distribution to Mr. Feroleto as an alternative. In any event, although we have found the loan not to have been embarked upon for the benefit of the corporation's employees, the loan was not a sham. Rather, the

parties intended to and did create a bona fide debtor-creditor relationship. The loan was, in fact, ultimately repaid. The mere fact that the repayments were not in accordance with the loan schedule does not inexorably lead to the conclusion that no bona fide debtor-creditor relationship ever came into being. We conclude on the basis of this record that Mr. Feroleto borrowed the $114,927.88 of trust assets in 1969 and did not receive a distribution in that year of his interest in the pension trust.

*Decision will be entered under Rule 155.*