T.C. Memo. 1998-295


UNITED STATES TAX COURT


SHEDCO, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17268-95R.                Filed August 12. 1998.


<u>John F. Daniels III</u> and <u>Neil H. Hiller</u>, for petitioner.

<u>Ann W. Durninq</u> and <u>J. Robert Cuatto</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  This case is before the Court upon a petition for declaratory judgment under section 7476 and Rule 211.  All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  The issue to be decided is whether petitioner's defined benefit plan

and trust qualify under sections 401 and 501 for plan year ended September 19, 1987, and for subsequent years.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and accompanying exhibits are incorporated into our findings by this reference.

Background

Petitioner was incorporated in Arizona on December 16, 1976. When it filed the petition, petitioner's principal place of business was in Sedona, Arizona.

All of petitioner's stock is, and always has been, owned by James N. Shedd (Mr. Shedd) and Jean Phelps Shedd (Mrs. Shedd) (hereinafter collectively referred to as the Shedds). Mr. Shedd is, and at all relevant time has been, vice president and secretary of petitioner. Mrs. Shedd is, and at all relevant times has been, president of petitioner.

Mr. Shedd

Mr. Shedd received a bachelor of arts degree from Park College in Missouri during 1943. During 1952, he began a career in banking as a loan officer trainee for First National Bank of Arizona (First National). From 1958 through 1962, Mr. Shedd took courses in banking through night classes offered by the American Institute of Banking. Additionally, he attended a 2-week course each year during 1961 through 1963 offered by Pacific Coast Bank School in Seattle, Washington.

Mr. Shedd served as a loan officer, specializing in real estate financing, for First National from 1952 until 1963. During 1963, he left First National to become president of Mission Mortgage Co. (Mission), a subsidiary of Lusk Corp. (Lusk), a publicly held home building company with headquarters in Tucson, Arizona. Mr. Shedd's responsibilities for Mission included obtaining construction and permanent financing for large cooperative housing projects in which Lusk was involved. Sometime later, he briefly served as corporate treasurer of Lusk. He left Lusk in January 1966 when the company went bankrupt.

Mr. Shedd then took a position with Arizona Trust Co. (Arizona Trust), a mortgage company. His responsibilities for Arizona Trust included originating loans to individuals and packaging the loans for resale to investors.

During spring 1968, Mr. Shedd was hired by Estes Bros. Construction Co. (Estes Bros.), an Arizona corporation. Estes Bros. built homes in the Tucson, Arizona, area. Mr. Shedd's primary responsibility for Estes Bros. was to obtain favorable financing at known discount rates so that Estes Bros. could provide favorable financing for its customers and maintain a reasonable cost structure for itself. During 1971, Mr. Shedd acquired 5 percent of the shares of Estes Bros. The remaining shares of Estes Bros. were owned by William Estes, Sr. (80 percent), and William Estes, Jr. (Mr. Estes) (15 percent).

During his career in real estate lending, Mr. Shedd became proficient at reading and analyzing financial statements of real estate developers and in evaluating their creditworthiness.

Formation of Petitioner, Estes Co., and Estes Homes

Singer Housing Co. (Singer Housing), a subsidiary of the Singer Sewing Machine Co., purchased all of the shares of Estes Bros. during August 1972 and renamed it the Estes Division of Singer Housing (Estes Division). Shortly thereafter, Estes Division purchased Staggs Built Homes, a large builder located in Phoenix, Arizona, and renamed it the Singer Housing Co. in Phoenix (Phoenix Division).

Mr. Shedd and Mr. Estes entered into 5-year employment agreements with Estes Division, commencing in 1972. Mr. Shedd served as manager of Estes Division's Tucson business (Tucson Division). In that capacity he was responsible for all phases of Estes Division's activities in Tucson, but he concentrated on financial matters related to marketing homes that Estes Division built in Tucson.

During 1976, Mr. Shedd and Mr. Estes decided to purchase Estes Division. To effectuate the purchase, the Shedds formed petitioner, and Mr. Estes and members of his family formed WE 7, Inc. (WE 7), an Arizona corporation. During January 1977, petitioner and WE 7 formed a partnership known as Estes Co., of

which petitioner and WE 7 were the general partners.[1]  When
formed, petitioner owned an equity interest in Estes Co. of
approximately 23.3 percent.

Also during January 1977, Estes Co. and Severn Corp.
(Severn), a wholly owned subsidiary of Singer Housing, formed
Estes Homes, a partnership which operated as a commercial and
residential real estate developer based in Tucson, Arizona.[2]  As
consideration for the transaction, petitioner and WE 7 in the
aggregate surrendered $200,000 in Singer Co. stock and assumed an
obligation of approximately $29 million, one-half of which was
owed to Singer Housing and the balance to local commercial banks.
Under the partnership agreement forming Estes Homes, the
partnership agreed to repay Severn's capital account plus an 8-
percent return on that account in semiannual distributions
through February 1987.  Severn did not participate in the
management of Estes Homes.

The Management Contract

---

[1]  Before Jan. 5, 1981, Guardian Construction Co., a general
partnership of which WE 7 and Guardian Development, Inc., an
Arizona corporation, were the general partners, also became a
partner of Estes Co.  Guardian Construction Co. was the managing
partner of Estes Co. sometime after Sept. 20, 1980, but at least
by Jan. 5, 1981.

[2]  During December 1986, WJL Resources, Inc. (WJL) acquired
Severn's interest in Estes Homes.  WJL was an affiliate of WE 7.
At some time, Estes Homes became known as RCP Investments and
Estes Co. became known as GWS.  For convenience, hereinafter we
use the names Estes Homes and Estes Co. throughout this opinion
to refer to those entities regardless of the names by which they
were known at the time.

After the formation of Estes Homes, Mr. Shedd continued as manager of the Tucson Division of Estes Co. During September 1980, a decision was made to transfer key management personnel from Estes Co. to petitioner in order to provide certain fringe benefits to those individuals. In furtherance of that decision, petitioner and Estes Co. entered into a management contract on September 20, 1980, in which petitioner agreed to employ certain management employees of Estes Co., including Mr. Shedd, Mr. Estes, and Jon Grove (Mr. Grove), among others, and through them to provide management services to Estes Co. Mr. Estes was designated president of Estes Co., Mr. Shedd was designated its executive vice president, and Mr. Grove was designated it vice president--finance. The management contract was amended on January 5, 1981, to state specifically that the provision of management services by petitioner was not to be construed as creating a partnership between petitioner and Estes Co.

Mr. Shedd served as executive vice president of Estes Co. until his retirement from that company during 1981. To effectuate his retirement, petitioner and WE 7 amended their partnership agreement to provide, in effect, for the buyout of petitioner's interest in Estes Co. Under the terms of the amended partnership agreement, dated January 5, 1981, WE 7 agreed to distribute petitioner's capital account over a 10-year period commencing August 31, 1981, as well as to pay interest on the outstanding balance at a rate of 9 percent until the capital

account was fully liquidated. Petitioner did not receive Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., from Estes Co. from 1981 through 1989 or 1990.

Petitioner employed Mr. Estes under the management contract from September 1980 through September 1985. He did not serve as an officer or director of petitioner during those years.

On September 30, 1986, petitioner's board of directors voted to terminate the management contract effective December 31, 1986. Formal notice of termination provided to Estes Co. was dated November 1, 1986. At the time the management contract was terminated, all of the employees originally listed in the contract had retired from or otherwise terminated their employment with petitioner except for Mr. Shedd, and he was preparing to retire from petitioner.

The Pension Plan

On September 18, 1980, petitioner adopted a defined benefit pension plan (the plan), effective September 20, 1979. Petitioner amended and restated the plan on December 5, 1985, effective for plan year ending September 19, 1985, and respondent issued a favorable determination letter as to the qualification of the plan and its related trust as restated (hereinafter collectively referred to as plan) on July 8, 1987. The determination letter cautioned: "Continued qualification of the plan will depend on its effect in operation under its present form."

Petitioner adopted the plan originally to provide pension benefits for employees covered under the management contract. By the end of 1985, the Shedds were the only active participants in the plan. Mr. Estes received the final distribution of his vested accrued benefit from the plan no later than December 31, 1986. Mr. Shedd began receiving distributions from the plan when he retired from petitioner during 1986. Mrs. Shedd retired from petitioner during 1990, and she began receiving distributions from the plan at that time. At various times from plan years ended September 19, 1987 through 1993, the Shedds' children and their spouses participated in the plan, and they have received any vested benefit to which they were entitled.

After his retirement from Estes Co., Mr. Shedd was not consulted about Estes Co.'s new loans, new projects, or ongoing projects. However, he was invited to, and often attended, quarterly meetings of the executives of Estes Co., and he was privy to their plans as well as to Estes Co.'s financial condition. On request, he was provided copies of Estes Co.'s financial statements.

Mr. Shedd has been a trustee of the plan since its inception, and he was its sole trustee after the plan was amended and restated. Mr. Estes and Mr. Grove served as trustees of the plan from its inception until 1985.

Section 8.3 of the plan agreement states as follows:

8.3 <u>LIMITATION ON TRUSTEE'S POWERS</u>. The Trustee's powers under the foregoing provisions of this section

may be exercised only in a fiduciary capacity.  The
Trustee shall discharge such powers and its duties
solely in the interest of the Participants and
Beneficiaries for the exclusive purpose of providing
benefits to them, defraying reasonable expenses of
administering the Plan, and with the care, skill,
prudence and diligence under the circumstances then
prevailing that a prudent man acting in a like capacity
and familiar with such matters would use in the conduct
of an enterprise of a like character and with like aim.
The Trustee shall diversify the investments of the Plan
so as to minimize the risk of large losses unless under
the circumstances it is clearly prudent not to do so.
The Trustee shall not make any investments outside of
the jurisdiction of the United States of America and
shall not engage in any prohibited transactions as
defined in the Code.

Petitioner made the following contributions to the plan for
the years listed:

| Year Ended | Contribution |
| --- | --- |
| 9/30/87 | $219,000 |
| 9/30/88 | -0- |
| 9/30/89 | 226,769 |
| 9/30/90 | 44,044 |
| 9/30/91 | -0- |
| 9/30/92 | 127,844 |
| 9/30/93 | 122,665 |

Loans to Estes Co. From the Plan Before 1986

The plan made loans to Estes Co. sometime before July 29,
1985.  During 1985, respondent began an examination of
petitioner's Forms 1120, U.S. Corporation Income Tax Returns, for
years ended September 30, 1980 through 1983.  At the same time,
respondent examined the plan for plan years ended September 19,
1982 and 1983.  Respondent determined that loans made to Estes
Co. by the plan constituted prohibited transactions because Estes
Co. was a disqualified person.  Respondent determined Estes Co.

was a disqualified person because Mr. Estes had an indirect ownership interest in Estes Co. through his interest in WE 7 and its interest in Guardian Construction Co., and he also served as a trustee of the plan. Estes Co. agreed to file Forms 5330, Return of Excise Taxes Related to Employee Benefit Plans, pay the excise taxes under section 4975 applicable to the prohibited transactions, and repay the loans.

The Loan to Estes Co. From the Plan During 1986

Sometime during 1986, Mr. Shedd approached Mr. Grove, who at the time was executive vice president of Estes Co., and suggested that Estes Co. borrow money from the plan. Subsequently, on December 25, 1986, the plan lent $2,250,000 to Estes Co. (the loan).

On behalf of Estes Co., Mr. Grove signed a promissory note relating to the loan dated December 25, 1986 (the note), and payable to Mr. Shedd as trustee of the plan. The note was payable on demand and bore interest on the unpaid balance, payable monthly commencing January 25, 1987, at the rate of seven-eights of 1 percent above the prime rate charged by the Wells Fargo Bank of California (Wells Fargo). The interest rate on the loan on its face was somewhat higher than Estes Co. was paying commercial banks, but the rate nonetheless was slightly advantageous to Estes Co. on an overall basis because the banks charged Estes Co. additional fees which the plan did not charge. The combined effect of the loan's rate of interest and lack of

fees was better than the plan could have received from another source.  Estes Co. pledged no collateral to secure the loan.

The proceeds from the loan were used by Estes Co. for general working capital needs.  When the loan was made, Estes Co. could have obtained funds from several other sources.

As of December 31, 1986, Estes Co. and Estes Homes had a revolving line of credit with Wells Fargo that expired during May 1987, and which was under negotiation for renewal on December 31, 1986.  The revolving credit agreement granted Wells Fargo a first deed of trust on essentially all real estate properties not pledged as security for other borrowing and an assignment of Estes Co.'s and Estes Homes' interests in all other assets except for the investment in affiliates.  The agreement imposed certain restrictions on Estes Co. and Estes Homes, including limitations on partner distributions and other borrowing, maximum debt-to-equity ratios, and restrictions on various real estate inventory levels.  Mr. Shedd was not involved in negotiating Estes Co.'s line of credit, and he had no control over the terms of the line of credit.

When the loan was made, Estes Co.'s line of credit from Wells Fargo had an available balance equal to or greater than the amount of the loan.  At that time, the plan would have had to obtain a waiver from Wells Fargo in order to secure the loan. Mr. Shedd thought that it was not necessary to seek a waiver from Wells Fargo in order to secure the loan, because he believed that

the unused portion of Estes Co.'s line of credit with Wells Fargo and the general conservative attitude of Estes Co.'s management provided sufficient protection for repayment of the loan.

Mr. Shedd understood the difference between secured and unsecured loans.  He knew that real estate loans often are secured loans.  While Mr. Shedd worked for First National and for Arizona Trust, neither company had lent 80 percent or more of its assets to one borrower on an unsecured basis.  Mr. Shedd was aware that Mission Mortgage had lent more than 80 percent of its assets to Lusk, and that Lusk subsequently became bankrupt.  Before making the loan, Mr. Shedd did not perform written calculations or prepare notes in which he recorded an analysis of Estes Co.'s financial statements.  Mr. Shedd thought the loan offered a good rate of return from a sound company with good management.

When the loan was made, the Shedds were the only active participants in the plan.  At that time, Mr. Estes was not a shareholder, director, officer, or employee of petitioner or a trustee of the plan.  Mr. Shedd suggested that Estes Co. borrow money from the plan, because the plan had money it could invest, and he believed that a loan with Estes Co. would be the best use of that money.

Mr. Shedd's decision to have the plan extend the loan to Estes Co. was influenced by the good track record of Estes Co. and the individuals who were managing that company, by his belief

that Estes Co. was in a strong financial condition, and by the previous loan history between Estes Co. and the plan. He felt comfortable about the plan's making the loan because of the demand feature in the note and the Wells Fargo line of credit.

When the loan was authorized, Mr. Shedd believed Estes Co. maintained a proper ratio of land held as inventory to land held for investment, a proper ratio of assets to liabilities, and a proper ratio of current assets to current liabilities. He believed that the demand feature provided sufficient liquidity for the loan.

Mr. Shedd did not consult with counsel or with the plan's actuarial firm about making the loan before the plan lent the money to Estes Co. He would not have suggested the loan to Estes Co. had he suspected that it would not be repaid. When the loan was made, Mr. Shedd believed that Estes Co. was creditworthy. Mrs. Shedd concurred with Mr. Shedd's opinion that the loan would be a good investment for the plan. There was no connection with termination of petitioner's management contract with Estes Co. and the extension of the loan by the plan to Estes Co.

During 1987, after speaking with the retirement portfolio department of Merrill Lynch & Co., Inc., Mr. Shedd asked Estes Co. to make periodic installment payments of principal on the loan so that the plan could diversify into other investments. Estes Co. orally agreed to make semiannual principal payments on the note in the amount of $250,000, commencing March 1988 and

continuing through February 1992.  The note remained subject to full repayment of principal and interest upon demand notwithstanding the oral agreement to amortize principal over 5 years.

Estes Co. made monthly payments of interest in accordance with the terms of the note through January 1989.  On March 8 and August 28, 1988, Estes Co. made payments of $250,000 each toward principal, thereby reducing the principal balance to $1,750,000.

Problems in the real estate economy in Arizona during the late 1980's resulted in declining real estate values in that State.  Mr. Estes advised the Shedds during December 1988 that Estes Co. was facing financial difficulties.  Estes Co. defaulted on the loan when it failed to make the monthly interest payment due February 25, 1989.  At the time of the default, the outstanding principal balance represented 58 percent of the plan's assets.  Following the default, Mr. Shedd concluded that collection of the outstanding principal balance was in jeopardy and that the note was worthless.  Consequently, for plan year ended September 19, 1989, the plan wrote off on its books as a worthless debt the principal balance remaining on the loan.

During July 1990, partly on the basis of Mr. Shedd's efforts, Estes Co. identified a pool of assets from which payments could be made to a limited group of creditors, including the plan.  Therefore, various entities in which Mr. Estes was involved (the Estes companies), including Estes Co. and Estes

Homes, executed the Collateral Pool Agreement, wherein the Estes companies agreed to make payments toward specified fixed amounts owed those creditors relating to defaulted loans. The amount specified for the plan was $1,878,026, representing the remaining principal balance of $1,750,000 plus accrued interest through September 30, 1989. In furtherance of the Collateral Pool Agreement, on July 30, 1990, Mr. Estes executed a nonnegotiable promissory note (new note), on behalf of Estes Homes, payable to the plan in the amount of $1,878,026. The new note was payable on demand, but no later than December 31, 1998, and bore interest on the unpaid principal at a rate of 18 percent.

For plan year ended September 19, 1990, the plan recognized as an asset on its balance sheet the new note, at a value of $809,000. As of the time of trial, the plan had received payments pursuant to the Collateral Pool Agreement in an amount somewhat in excess of $200,000. As of the time of trial, approximately $1.8 million, including principal and accrued interest, remained unpaid on the loan.

Estes Co. filed for protection under the Bankruptcy Code during late 1994 or 1995. The bankruptcy court ultimately awarded petitioner $1 for its interest in Estes Co.

Revocation of Qualified Status of the Plan

During 1991, respondent began an audit of the plan for plan year ended September 19, 1989. The examination subsequently was expanded to cover plan years ended September 19, 1985 through

1992. As a result of that examination, respondent determined that the plan was not operated exclusively for the benefit of petitioner's employees pursuant to the requirements of section 401(a)(2). Respondent based that determination on the conclusion that the loan was not a prudent investment and caused the plan to lack diversity of assets. Accordingly, on June 9, 1995, respondent issued a final revocation letter revoking the favorable determination letter dated July 8, 1987, on the ground that the plan did not meet the requirements of section 401(a) for the plan year ended September 19, 1987, and all subsequent years, with the consequence that its related trust was not exempt from income tax under section 501(a).

Other Business Dealings Between Mr. Shedd and Mr. Estes or Related Entities

Throughout the years, Mr. Shedd and Mr. Estes have entered into a number of business ventures. For example, Mr. Shedd owns a 25-percent interest and Mr. Estes owns a 75-percent interest in Adam Development Co. (Adam Development), a land holding partnership formed during 1977. Mr. Shedd owns a 25-percent interest and Mr. Estes and other Estes employees own the remaining interest in Brava, a partnership formed during 1977 or 1978 to purchase model homes from Estes Co. and then to lease them back to Estes Co. During 1977 or 1978, Mr. Shedd owned a 24-percent interest and Mr. Estes and other Estes employees owned the remaining interest in Caprice, a partnership formed to

develop a business park in Phoenix, Arizona.  During 1977 or 1978, Mr. Shedd, Mr. Estes, and others formed Dakota, a partnership, to hold a piece of land on the south side of Tucson for future development.  Around 1977, Mr. Shedd, Mr. Estes, and others formed EDC, a partnership.  Mr. Shedd was a partner in EDC until approximately 1982 or 1983.  Additionally, from approximately 1977 until 1981, Mr. Shedd and Mr. Estes were coowners of Tucson Photo Engraving, a photo-developing corporation in Tucson.

During 1980, petitioner and Estes Co. shared the same address.  During 1986 and 1987, petitioner had the same address as did three entities related to Mr. Estes.[3]  At one time, Estes Co. personnel kept petitioner's books and prepared petitioner's income tax returns.

Mr. Shedd, as secretary of petitioner, identified petitioner as a general partner of Estes Co. in a corporate resolution made at a board of directors meeting held on February 26, 1985, as well as in an acknowledgment dated March 8, 1985.  The notes to Estes Co. and Estes Homes Combined Financial Statements for years ended December 31, 1986 and 1985, identify petitioner, WE 7, and

---

[3]  At trial we took under advisement petitioners's relevancy objections to respondent's Exhibits BG, BH, and BI, upon which the above findings of fact are based.  We find those documents relevant to the issue of whether the loan was made for a reason other than for the exclusive benefit of the plan participants and their beneficiaries and, accordingly, find the disputed exhibits admissible.  Fed. R. Evid. 401, 402.

the Guardian Construction Co., Inc., as corporate partners of Estes Co. Petitioner was identified as a partner of Estes Co. in a settlement agreement with an unrelated party executed on September 21, 1990. The Superior Court of the State of Arizona, in and for the County of Pima, in a final judgment dated September 30, 1996, relating to a complaint filed on October 18, 1993, by Walter McBee and Triple L Distributing Co., against Estes Homes and other entities, found that petitioner's partnership interest in Estes Homes was terminated before the subject matter in that case arose.[4]

## OPINION

This Court may exercise jurisdiction over a declaratory judgment action if there is an actual controversy involving a determination by the Secretary with respect to the initial or continuing qualification of a retirement plan. Sec. 7476(a); Loftus v. Commissioner, 90 T.C. 845, 855 (1988), affd. without published opinion 872 F.2d 1021 (2d Cir. 1989).

Petitioner contends that the plan did not violate the exclusive benefit rule and therefore should remain qualified. Respondent contends that the plan is not a qualified plan within the meaning of section 401(a) for plan year ended September 19, 1987, and for subsequent years because its investments and

---

[4] The complaint filed in the Superior Court indicates that the subject matter of the case involved a contract to purchase a portion of a shopping center entered into on Aug. 3, 1987.

administration violated the exclusive benefit rule of section 401(a)(2).  Specifically, respondent contends that the plan failed to satisfy the exclusive benefit rule when it lent 90 percent of its assets on an unsecured basis to Estes Co., with whom both Mr. Shedd and petitioner had significant and longtime financial relationships.[5]  When the loan was made, Mr. Shedd had retired from both petitioner and Estes Co., he was receiving benefits from the plan, and petitioner's equity interest in Estes Co. was being liquidated over a 10-year period which had begun in 1981.

Section 404(a)(1)(A) provides that contributions to a pension trust are deductible by the employer if the trust is exempt from tax under section 501(a).  In order for the trust to be entitled to tax-exempt status under section 501(a), a retirement plan must be established by an employer and meet all the requirements of section 401(a).  Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 230 (1987), affd. 862 F.2d 751 (9th Cir. 1988).  If a trust qualifies under section 401(a), contributions to the trust on behalf of employees are not includable in the employees' income until the year money is actually distributed to the employees.  Sec. 402(a)(1); Ludden v. Commissioner, 68 T.C. 826, 829-830 (1977), affd. 620 F.2d 700 (9th Cir. 1980).  However, if the trust fails to qualify under

_____

[5]  At time of default in February 1989 the loan represented 58 percent of the plan's assets.

section 401(a), whether employer contributions are to be included in the employees' incomes is determined in accordance with section 83.  Sec. 402(b); Ludden v. Commissioner, supra at 830. In determining whether a plan is qualified under section 401(a), the operation of the trust is relevant as are its terms. Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869, 876 (1984); Quality Brands, Inc. v. Commissioner, 67 T.C. 167, 174 (1976); sec. 1.401-1(b)(3), Income Tax Regs.

Section 401(a)(2)[6] provides that for a trust forming part of an employer's pension plan to be exempt, it must be impossible, at any time prior to the satisfaction of all liabilities with respect to the employer's employees and their beneficiaries under the trust, for any part of the corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of

_____

[6] Sec. 401(a) provides, in pertinent part, as follows:

    SEC. 401(a).  Requirements for Qualification.--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section--

        *      *      *      *      *      *      *

        (2)  if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be * * * used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries * * *

those employees or beneficiaries. "[T]he phrase 'purposes other than for the exclusive benefit of his employees or their beneficiaries' includes all objects or aims not solely designed for the satisfaction of all liabilities to employees or their beneficiaries covered by the trust." Sec. 1.401-2(a)(3), Income Tax Regs. However, the requirement that the trust be administered for the exclusive benefit of the employees is not to be construed literally. Time Oil Co. v. Commissioner, 258 F.2d 237 (9th Cir. 1958), revg. and remanding 26 T.C. 1061 (1956); Bing Management Co. v. Commissioner, T.C. Memo. 1977-403. To that effect, the Commissioner has indicated that the exclusive benefit test of section 401(a)(2) does not prohibit others from benefiting from a transaction as long as the primary purpose of the investment is to benefit employees or their beneficiaries. E.g., Rev. Rul. 73-532, 1973-2 C.B. 128; Rev. Rul. 69-494, 1969-2 C.B. 88.[7]

_____

[7] A revenue ruling represents the Commissioner's position on the application of tax law to specific facts. See Intel Corp. & Consol. Subs. v. Commissioner, 100 T.C. 616, 621 (1993), affd. 67 F.3d 1445 (9th Cir. 1995), amended and superseded on denial of rehearing 76 F.3d 976 (9th Cir. 1995); see also Brook, Inc. v. Commissioner, 799 F.2d 833, 836 n.4 (2d Cir. 1986), affg. T.C. Memo. 1985-462, supplemented by T.C. Memo. 1985-614. Revenue rulings do not constitute binding authority on this Court. Stark v. Commissioner, 86 T.C. 243, 251 (1986); Neuhoff v. Commissioner, 75 T.C. 36, 46 (1980), affd. per curiam 669 F.2d 291 (5th Cir. 1982); see also Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294 (1986); Propstra v. United States, 680 F.2d 1248, 1256-1257 (9th Cir. 1982).

(continued...)

Petitioner contends that, when made, the loan was a prudent investment. In support of its contention, petitioner asserts that the primary purpose of the loan--to obtain an above-market return on the investment, with minimal risk--was a proper purpose and that in making the loan there was no incidental benefit to petitioner or Mr. Shedd. Petitioner contends further that Mr. Shedd was qualified to evaluate the loan and that, for that purpose, he used criteria he had used as a commercial real estate loan officer. Accordingly, petitioner asserts, before the plan made the loan to Estes Co., Mr. Shedd considered alternative investments, the relative safety of the loan, the prior loan history of Estes Co. and the plan, and the demand feature of the note. Petitioner contends further that, in determining that the loan was an imprudent investment, respondent focused solely on the ultimate result of the investment and not on Mr. Shedd's conduct in deciding to have the plan lend money to Estes Co. Petitioner also maintains that the loan satisfied the factors set

---

[7](...continued)
Nonetheless, where appropriate, we may adopt the reasoning on which the revenue ruling is based. Estate of Lang v. Commissioner, 64 T.C. 404, 406-407 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980). Moreover, the Court of Appeals for the Ninth Circuit, to which an appeal in the instant case would lie, has indicated that it would "give added weight to an established revenue ruling that fell 'within * * *[the Commissioner's] authority to implement the congressional mandate in some reasonable manner.'" Estate of Lang v. Commissioner, 613 F.2d at 776 (quoting Gino v. Commissioner, 538 F.2d 833, 835 (9th Cir. 1976)); see also Propstra v. United States, supra.

forth in Rev. Rul. 69-494, supra,[8] and therefore the plan met the exclusive benefit rule.

In further support of its contention that the loan did not violate the exclusive benefit rule, petitioner asserts that the loan was not a violation of fiduciary standards--it provided a fair return, left the plan sufficiently liquid to permit distributions, and embodied safeguards which a prudent investor would expect. Thus, petitioner contends, Mr. Shedd met the fiduciary standards of section 404(a)(1),[9] of title I of the

---

[8] In Rev. Rul. 69-494, 1969-2 C.B. 88, the Commissioner set forth the following four general requirements that must be met before an investment of funds from a qualified plan in employer stock or securities will satisfy the exclusive benefit rule of sec. 401(a): (1) The cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present. Rev. Rul. 73-532, 1973-2 C.B. 128, extended the reasoning of Rev. Rul. 69-494, supra, to investments not involving employer securities.

[9] Sec. 404(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 877, provides as follows:

Sec. 404.(a)(1) Subject to sections 403(c) and (d), 4042, and 4044, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent
(continued...)

Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 877.

Petitioner contends further that violation of the prudent investor rule is not necessarily a violation of the exclusive benefit rule. Petitioner asserts that, even if the loan was not prudent, the lack of prudence may be evidence of an exclusive benefit rule violation, but it is not conclusive.

Additionally, petitioner contends that when the loan was made, the plan was not subject to title I of ERISA, because the Shedds were the plan's sole participants and that under Department of Labor (DOL) regulations, 29 C.F.R. sec. 2510.3-3(b) and (c)(1) (1997),[10] no "employee" was a participant in the plan

_____

[9](...continued)
man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title.

[10] 29 C.F.R. sec. 2510.3-3(b) and (c)(1) (1997), provides in pertinent part as follows:

(b) Plans without employees. For purposes of Title I of the Act and this chapter, the term "employee benefit plan" shall not include any plan, * * * under which no employees are participants covered under the plan, * * *.

(c) Employees. For purposes of this section:

(continued...)

because the Shedds, who were the sole shareholders of petitioner, were also its only employees. Petitioner asserts that the failure to diversify is irrelevant to a determination of prudence with respect to plans not subject to title I of ERISA.

Petitioner maintains further that under ERISA, even when title I applies to a pension plan, a fiduciary cannot breach the prudent investor rule by failing to diversify where the asserted failure to diversify is because of a beneficiary-directed investment. Accordingly, petitioner contends, a failure to diversify is not a violation of the prudent investor rule where, as in the instant case, title I does not apply and the sole participants of the plan, in effect, make investment decisions in their capacity as the ultimate beneficiaries, and not as fiduciaries of the plan.

Citing H. Conf. Rept. 93-1280, at 302 (1974), 1974-3 C.B. 415, 463, infra pp. 28-29, respondent contends that the ERISA section 404(a) fiduciary requirements for investing trust funds under the prudent investor rule--i.e., that (1) a fiduciary must discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries, and (2) he

---

[10](...continued)

(1) An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his spouse, and * * *

or she must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent investor, acting in like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims--were deemed to be coextensive with the exclusive benefit requirements.  Relying on Rev. Rul. 69-494, supra, respondent contends that to satisfy the exclusive benefit rule a plan must invest its funds in a manner which assures a fair return on the investments, provides the plan with sufficient liquidity to meet the needs of the plan, and provides the plan with sufficient diversification and security to guard against risk of loss. Respondent contends that, in lending 90 percent of the plan's assets to Estes Co., Mr. Shedd did not act prudently, because he failed to diversify plan investments, to secure the loan, and to consult with counsel about the propriety of making the loan.

Respondent also maintains that Mr. Shedd had sufficient knowledge and skills to understand that the loan was imprudent particularly in view of his substantial knowledge about lending to real estate developers.  Respondent contends that the loan did not meet basic, commonsense standards for security and diversification.  Respondent contends further that the Shedds and petitioner had significant financial dealings with Mr. Estes and his related companies and that the relationship between them motivated Mr. Shedd to make the loan.

Additionally, respondent contends that the loan violated the plan provision requiring the trustee to diversify the investments of the plan so as to minimize the risk of large losses unless it was clearly prudent not to do so. Respondent contends further that Mr. Shedd failed to demonstrate that it was clearly prudent not to diversify plan investments.

Whether a plan has been operated for the exclusive benefit of employees and their beneficiaries is determined on the basis of the facts and circumstances. See Feroleto Steel Co. v. Commissioner, 69 T.C. 97, 107 (1977); sec. 1.401-1(b)(3), Income Tax Regs.;[11] see also Bernard McMenamy, Contractor, Inc. v. Commissioner, 442 F.2d 359 (8th Cir. 1971), affg. 54 T.C. 1057 (1970); Time Oil Co. v. Commissioner, 258 F.2d at 238-239. If a violation of the exclusive benefit rule is found, then we look to the totality of the transgressions that occurred in assessing whether it is an abuse of discretion for the Commissioner to disqualify the plan. The discretion to disqualify a plan should be exercised with restraint, however, because the DOL and the Internal Revenue Service have a broad range of alternative remedies available to ensure that a trust is properly

---

[11] Sec. 1.401-1(b)(3), Income Tax Regs., states in pertinent part as follows:

> All of the surrounding and attendant circumstances and the details of the plan will be indicative of whether it is a bona fide stock bonus, pension, or profit-sharing plan for the exclusive benefit of employees in general. The law is concerned not only with the form of a plan but also with its effects in operation. * * *

administered.  <u>Winger's Dept. Store, Inc. v. Commissioner</u>, 82 T.C. at 887-888.

Neither the Code nor the regulations provide specific rules identifying the types of investments which are considered to satisfy or violate the exclusive benefit rule.  <u>Id.</u> Notwithstanding the lack of statutory and regulatory guidance, this Court and other courts have recognized that, in appropriate situations, improper investment practices of the trust may warrant disqualification of the related pension plan under the exclusive benefit rule.  E.g., <u>id.</u> at 878 and the cases cited thereat.

ERISA section 404(a)(1) requires a plan fiduciary to discharge his or her duties for the exclusive purpose of (1) providing benefits to participants and their beneficiaries and (2) defraying reasonable expenses of the plan.  Additionally, the fiduciary must (1) perform those duties with the care, skill, prudence, and diligence that a prudent investor would exercise under similar circumstances, (2) diversify investments to minimize the risk of large losses, unless diversification clearly is not prudent under the circumstances, and (3) discharge those duties pursuant to the terms of the plan to the extent they are consistent with the provisions of title I.  <u>Id.</u>  The legislative history of ERISA section 404(a), however, cautions:  "It is expected that courts will interpret the prudent man rule and other fiduciary standards bearing in mind the special nature and

purposes of employee benefit plans intended to be effectuated by the Act." H. Rept. 93-533, at 12 (1973), 1974-3 C.B. 210, 221.[12] Thus, we must "recognize that a fiduciary's duties are circumscribed by Congress' overriding goal of ensuring 'the soundness and stability of plans with respect to adequate funds to pay promised benefits.'" Acosta v. Pacific Enters., 950 F.2d 611, 618 (9th Cir. 1992) (quoting 29 U.S.C. sec. 1001 (1988)).

We conclude that the prudent investor principles of ERISA section 404 apply to an exclusive benefit determination under section 401(a)(2), regardless of whether title I of ERISA applies to the plan. We find support for our conclusion in the following excerpt from the conference report on ERISA:

Basic fiduciary rules

Prudent man standard.--The substitute requires that each fiduciary of a plan act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting an enterprise of like character and with like aims. The conferees expect that the courts will interpret this prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans.

Under the Internal Revenue Code, qualified retirement plans must be for the exclusive benefit of the employees and their beneficiaries. Following this requirement, the Internal Revenue Service has developed general rules that govern the investment of plan assets, including a requirement that cost must not exceed fair market value at the time of purchase, there must be a fair return commensurate with the prevailing rate, sufficient liquidity

_____

[12] The quoted material from H. Rept. 93-533, at 12 (1973), 1974-3 C.B. 210, 221, describes H.R. 2, 93d Cong., 2d Sess. sec. 111(b)(1) (1974) as reported by the House Committee on Education and Labor, on Oct. 2, 1973, which became ERISA sec. 404(a)(1).

> must be maintained to permit distributions, and the safeguards and diversity that a prudent investor would adhere to must be present. <u>The conferees intend that to the extent that a fiduciary meets the prudent man rule of the labor provisions, he will be deemed to meet these aspects of the exclusive benefit requirements under the Internal Revenue Code</u>. [H. Conf. Rept. 93-1280, <u>supra</u> at 302, 1974-3 C.B. at 463; emphasis added.]

We understand the underscored language to indicate a congressional intent that the factors applied in determining whether an investment meets the prudent investor requirement of ERISA section 404(a)(1) are relevant to whether that investment satisfies the exclusive benefit rule requirement of section 401(a)(2). We find nothing in that legislative history which suggests that the prudent investor provision should be considered in an exclusive benefit determination only if the plan is subject to title I of ERISA. In view of our conclusion that the prudent investor principles of ERISA apply in the instant case, we do not decide whether the plan was subject to title I of ERISA when the loan was made.

We previously have held that the standards for fiduciary behavior set forth in ERISA section 404(a)(1) may be used to help determine whether the exclusive benefit rule has been violated. <u>Ada Orthopedic, Inc. v. Commissioner</u>, T.C. Memo. 1994-606; see also <u>Calfee, Halter & Griswold v. Commissioner</u>, 88 T.C. 641, 652 (1987) ("the standards of Title I and Title II [of ERISA] were closely coordinated by Congress specifically to develop a unified set of rules").

The DOL regulations state that a fiduciary will satisfy the prudent investor requirements of ERISA section 404(a)(1)(B) if the fiduciary (i) gives appropriate consideration to the relevant facts and circumstances of the investment or investment course of action and (ii) acts accordingly.  29 C.F.R. sec. 2550.404a-1(b)(1) (1997).  Pursuant to those regulations,

> "appropriate consideration" shall include, but is not necessarily limited to,

> (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio * * * , to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and

> (ii) Consideration of the following factors * * * :

> (A) The composition of the portfolio with regard to diversification;

> (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

> (C) The projected return of the portfolio relative to the funding objectives of the plan.  [29 C.F.R. 2550.404a-1(b)(2).]

The DOL requirements appear consistent with criteria set forth by the Commissioner in Rev. Rul. 69-494, 1969-2 C.B. 88, for testing compliance with the exclusive benefit requirement of section 401(a)(2).  Those criteria are (1) cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions

in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present.  We previously have indicated that the criteria listed in Rev. Rul. 69-494, supra, although not binding on the Court, are relevant to a determination as to whether the prudent investor requirements have been satisfied.  Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869 (1984); Feroleto Steel Co. v. Commissioner, 69 T.C. 97 (1977); see also Ada Orthopedic, Inc. v. Commissioner, supra.

Additionally, in applying the prudent investor rule, it has been stated:

> Under ERISA, as well as at common law, courts have focused the inquiry under the "prudent man" rule on a review of the fiduciary's independent investigation of the merits of a particular investment, rather than on an evaluation of the merits alone.  As a leading commentator puts it, "the test of prudence--the Prudent Man Rule--is one of conduct, and not a test of the result of performance of the investment. The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed."  In addition, the prudent man rule as codified in ERISA is a flexible standard:  the adequacy of a fiduciary's investigation is to be evaluated in light of the "character and aims" of the particular type of plan he serves.  [Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983); fn. ref. omitted; citations omitted.]

Thus, the ultimate outcome of an investment is not proof that the investment failed to meet the prudent investor rule.  DeBruyne v. Equitable Life Assur. Socy. of U.S., 920 F.2d 457, 465 (7th Cir. 1990); see also Norton Bankruptcy Law and Practice 2d, sec. 156:9 (1997-98).

Accordingly, in determining whether a plan has satisfied the exclusive benefit rule, we must consider the risk of the loan to the plan when the loan was made, taking into account its relative safety, its effect on the diversity and liquidity of the plan's assets, its profit potential, and the trustee's rationale for making the loan. We also must consider whether the loan complies with the terms of the plan.

In our view, the loan was not a prudent investment for the plan. When made, the loan constituted approximately 90 percent of the plan's assets. The promissory note evidencing the loan was not secured. Estes Co. used the loan for working capital needs, not to acquire assets. When the loan was made, essentially all of Estes Co.'s and Estes Homes' property already was pledged as collateral for loans those entities had received from Wells Fargo or other creditors. Although Estes Co. had available on its line of credit with Wells Fargo a balance equal to or greater than the amount of the loan when the loan was made, the plan extracted no commitment from Estes Co. and Estes Homes that they would keep that balance available for the benefit of the plan. Moreover, petitioner had no guaranty that Wells Fargo, or any other creditor of Estes Co., would continue to extend credit to Estes Co. in the future, especially should Estes Co. or Estes Homes experience financial difficulties. Consequently, the line of credit provided no security for the loan and the note was

backed by nothing more than Estes Co.'s promise to repay the loan.

Furthermore, the expected rate of return (seven-eights of 1 percent above the prime rate charged by Wells Fargo) does not appear to be commensurate with the high degree of risk to which the loan exposed the plan. The note was unsecured. The loan was extended to a single borrower which was involved in developing real estate, a business dependent on economic factors not within its control. Additionally, Estes Co. and Estes Homes built and sold property in a relatively small geographic area, making them more vulnerable to fluctuations in the real estate market. Although Mr. Shedd had extensive experience in real estate financing and marketing, he went against normal practice in real estate financing by not securing the note and by lending a substantial portion of the plan's assets to one borrower on nothing more than a promise to repay. In essence, Mr. Shedd was gambling that the Tucson and Phoenix real estate markets would remain healthy and that Estes Co. and Estes Homes would continue to prosper. We believe that a prudent investor under similar circumstances would not have extended a loan to Estes Co. under similar terms.

Additionally, we believe that the loan does not comply with section 8.3 of the plan agreement which, among other things, requires the trustee to diversify investments so as to minimize the risk of large losses. We are not persuaded that it was

clearly prudent not to diversify. The loan entrusted 90 percent of the plan's assets, over $2 million, on an unsecured basis to one creditor that operated in a limited geographic area and in a risky business. In our view, the trustee did not minimize the risk of a large loss.

We do not agree with petitioner that diversification is not relevant in the instant case. Whether plan assets are sufficiently diversified as a result of an investment is one factor in determining whether the prudent investor rule has been satisfied. The exception for participant-directed investments involves individual account plans, not defined benefit plans, as is involved in the instant case. The participant-directed exception, therefore, is not applicable here. See ERISA sec. 404(c).[13] Following the loan, the plan's assets were not diversified. The note was not secured. Consequently, when made, the loan was a risky investment for the plan. On the basis of

---

[13] ERISA sec. 404(c) provides as follows:

(c) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, if a participant or beneficiary exercises control over the assets in his account(as determined under regulations of the Secretary)--

(1) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and

(2) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

the foregoing, we conclude that, in extending the Loan to Estes Co., the plan violated the prudent investor rule.

Nevertheless, an isolated violation of the prudent investor rule, although a factor to be considered, does not, of itself, require a finding that the plan was not operated for the exclusive benefit of the employees or their beneficiaries. We must look at the entire picture in assessing whether the plan violated the exclusive benefit rule. See Feroleto Steel Co. v. Commissioner, 69 T.C. at 107. Mr. Shedd made an error in judgment in having the plan lend money to Estes Co. without security. We are persuaded, however, that Mr. Shedd intended the plan, and thereby the participants, to benefit from the loan. Indeed, on the basis of the record, we believe that the plan would have profited from the loan if the depression in the real estate market had not occurred in Arizona during the late 1980's. The loan proceeds did not flow back to petitioner, nor were they diverted for the personal benefit of the Shedds or Mr. Estes. Interest was stated on the note at market rate, and payments were being made until Estes Co. and Estes Homes began to experience financial difficulties. Viewing the total picture, we conclude that the loan was an isolated violation of the prudent investor rule, but that violation was not so serious as to constitute a violation of the exclusive benefit requirement of section 401(a).

In Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869 (1984), the trustees of an employer-sponsored defined benefit

pension plan lent a major portion of the trust's assets to the employer, through the employer's sole shareholder, to meet the company's working capital needs. The loans were unsecured, interest payments to the trust were delinquent, and most of the principal was not repaid. The sole shareholder and his spouse were cotrustees of the trust, and most of the benefits under the plan accrued to the sole shareholder. We found under the circumstances that the trust had not been operated for the exclusive benefit of the employees and their beneficiaries, and we upheld the Commissioner's determination that the related plan was no longer qualified under section 401(a).

In Ada Orthopedic, Inc. v. Commissioner, T.C. Memo. 1997-606, the trustees of an employer-sponsored defined benefit plan lent a substantial portion of the plan's assets through unsecured loans to participants, relatives, and friends of the trustees. Some of the loans were made or extended without written promissory notes, and principal and interest remained unpaid on some of the loans. In addition, the trust acquired real property by unrecorded quitclaim deeds without investigating title and subsequently lost that property upon foreclosure of preexisting mortgages; the trust invested in a tax-shelter partnership in which one of the trustees and his relatives also held interests; the trust acquired three loose diamonds, the largest of which could not be located; and the plan disbursed plan assets to nonparticipants without explanation. We found under those

circumstances that the trust's investment practices violated the exclusive benefit rule. Accordingly, we upheld the Commissioner's determination that the plan was no longer qualified.

The facts in <u>Winger's Dept. Store, Inc. v. Commissioner</u>, <u>supra</u>, and <u>Ada Orthopedic, Inc. v. Commissioner</u>, <u>supra</u>, reveal investment philosophies that were not aimed primarily at providing benefits for the employees and their beneficiaries in general but instead were aimed at benefiting the plan sponsors or certain individuals. The investment practices in those cases involved flagrant violations of the exclusive benefit rule.

As we stated previously, the record reveals that the loan constituted an isolated violation of the prudent investor rule. Mr. Shedd sought the loan because he believed it would be a good investment for the plan, and not because he sought a benefit for himself (other than as a beneficiary of the plan), petitioner, Estes Co., or others. He recommended the loan because he had extensive experience in the real estate financing area and therefore he felt confident in his ability to evaluate the investment. Mr. Shedd approached Estes Co. about the loan because he believed that Estes Co. was strong financially, and he trusted the abilities of its management personnel to maintain that strong position. He assumed that Estes Co. would repay the loan. Mr. Shedd made an error in judgment in having the plan

lend most of the plan's assets to one borrower and in not securing the note.

In the instant case, we do not find the indifference toward the continued well-being of the plan that we found in Winger's Dept. Store, Inc. v. Commissioner, supra and in Ada Orthopedic Inc. v. Commissioner, supra. Interest on the loan was paid timely until January 1989, when a depression in the real estate market in Arizona resulted in financial problems for Estes Co. and Estes Homes. Additionally, although the loan was extended on a demand basis on December 25, 1986, in order to diversify the plan's assets, during 1987 Mr. Shedd sought and obtained Estes Co.'s agreement to amortize payment of the loan over a 5-year period, commencing in March 1988. Two payments of $250,000 each were made during 1988, and the plan used the payments to acquire other, safer investments for the plan. Additionally, after Estes Co. defaulted on payment of the note, Mr. Shedd took an active role in attempting to locate assets of the Estes companies which could be used toward payment of the loan. Estes Co.'s inability to repay the loan resulted from a downturn in the real estate market and not from impropriety on its part.

The longstanding business relationship between petitioner and Estes Co., and among the Shedds, Mr. Estes, and the Estes companies, requires that we give the loan closer scrutiny. Nevertheless, even after that scrutiny, we do not find an attempt to manipulate the plan's assets for the benefit of petitioner,

the Shedds, Mr. Estes, or Estes Co.  The loan did not hinder the annual payment of benefits.  Estes Co. received some benefit in that, on an overall basis, the cost of borrowing the money from the plan was slightly less than the cost of borrowing a similar amount from another source.  Nonetheless, we are persuaded that the primary purpose of the loan was to benefit plan participants.  Consequently, although the loan failed to meet the prudent investor test, we find that it did not violate the exclusive benefit rule.  Accordingly, we conclude that extension of the loan to Estes Co. did not cause the plan to fail to satisfy the requirements of sections 401(a) and 501 for plan years ended September 19, 1987, and for subsequent years.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.